SATTERFIELD *v.* MALONE *et al.*

(*Circuit Court, W. D. Pennsylvania.* June 22, 1888.)

1. MORTGAGE—DEED ABSOLUTE ON FACE—EVIDENCE.
   To convert a deed absolute on its face into a mortgage, by parol testimony, such testimony must be clear and specific; of a character such as will leave in the mind of the chancellor no hesitation or doubt.[1]

2. NOTICE—HUSBAND AND WIFE.
   The knowledge of a husband of facts affecting the title to real estate purchased by his wife, is not imputable to her, where the purchase is not effected through his agency, and he takes no part in the negotiations.

3. SAME—PRINCIPAL AND AGENT.
   The established doctrine in Pennsylvania is that the principal is not affected by his agent's knowledge, unless it is shown that such knowledge was acquired by the agent in the course of the business in which he was employed for his principal.[2]

[1] To convert a deed absolute on its face into a mortgage, the evidence should be clear and convincing. Cochrane v. Price, (Md.) 8 Atl. Rep. 361, and cases cited in note; Knapp v. Bailey, (Me.) 9 Atl. Rep. 122, and note; Pancake v. Cauffman, (Pa.) 7 Atl. Rep. 67, and note; McCormick v. Herndon, (Wis.) 31 N. W. Rep. 303; Canal Co. v. Crawford, (Or.) 4 Pac. Rep. 113. For facts held sufficient, see Id.; McMillan v. Bissell, (Mich.) 29 N. W. Rep. 737, and note; Huscheon v. Huscheon, (Cal.) 12 Pac. Rep. 410; Arnot v. Baird, Id. 386; Stephens v. Allen, (Or.) 3 Pac. Rep. 168; Miller v. Ausenig, (Wash. T.) Id. 111; Cosby v. Buchanan, (Ala.) 1 South. Rep. 898; Pearson v. Sharp, (Pa.) 9 Atl. Rep. 38. See, also, Rogers v. Beach, (Ind.) 17 N. E. Rep. 609; Knaus v. Dreher, (Ala.) 4 South. Rep. 287.

[2] As to how far the knowledge of an agent is notice to the principal, see Huff v. Farwell, (Iowa,) 25 N. W. Rep. 252, and note.

4. SAME.

While the rule as declared by the supreme court of the United States is that the principal is affected by his agent's knowledge, no matter when acquired, it is subject to the important qualification that the principal is not bound by his agent's prior knowledge, unless it be present to the agent's mind at the time of acting for his principal, of which there should be clear and satisfactory proof.

5. SAME—RUMOR.

Mere rumors of a defect of title are not notice to a purchaser of real estate, nor do they impose upon him the duty of inquiry. To affect him the information should come from some one interested in the estate, or from some authoritative source.

6. SAME—RECORD AS NOTICE.

A purchaser is not affected with constructive notice of anything which does not lie in the line of the title.[1]

7. SAME.

A purchaser finding on record a deed conveying an absolute title to land, and referring to nothing beyond, was not bound to prosecute a later search; and therefore is not chargeable with constructive notice of a foreign attachment against the land in a suit commenced after the date of the record of the deed.[1]

8. FRAUD—EVIDENCE.

Circumstances calculated to excite suspicion are not enough to establish fraud.[2]

9. SAME.

The evidence examined, and conclusion reached that the charge of actual fraud made in the bill is not sustained.[2]

In Equity.

*Roger Sherman*, for complainant.

*D. T. Watson* and *J. W. Lee*, for respondents.

ACHESON, J.    This bill is in aid of an action of ejectment pending in this court, brought by the plaintiff, John Satterfield, against H. P. Malone, and Emma E. Malone, his wife, two of the defendants herein, for the recovery of certain oil-producing lands situate in McKean county, Pa.    The real parties to the controversy are the plaintiff and Mrs. Emma E. Malone, each of whom claims title to the lands under George A. Baker, who owned them in fee.    By his two deeds, purporting to convey an indefeasible title in fee-simple, dated and acknowledged November 20, 1880, and duly recorded in McKean county on February 12, 1881, George A. Baker, for the expressed aggregate consideration of $150,000, conveyed said lands to Dr. Azariah Everett, who, by his deeds dated December 17, 1883, conveyed the same to Lewis E. Mallory, who a few days thereafter conveyed the same to Mrs. Emma E. Malone, for the expressed consideration of $20,000.    On May 19, 1881, Hilton & Waugh began suit by writ of foreign attachment in the court of common pleas of McKean county against George A. Baker, and on the next day

[1]As to when and how far recitals in deeds are constructive notice to a purchaser, sufficient to put him on inquiry, see Roll v. Rea, (N. J.) 12 Atl. Rep. 905, and cases cited in note.

[2]As to what is evidence of fraud, and how fraud is proven, see Mooring v. Little, (N. C.) 4 S. E. Rep. 485; Robinson v. Woodmansee, (Ga.) Id. 497, and cases cited in note; Riley v. Melquist, (Neb.) 36 N. W. Rep. 657, and note; Cox v. Cox, (Kan.) 17 Pac. Rep. 847. On the general subject of fraud, see the exhaustive note to Knight v. Kidder, (Me.) 1 Atl. Rep. 142; Marmon v. Harwood, (Ill.) 16 N. E. Rep 236, and cases cited in note.

the sheriff, by virtue of said writ, attached Baker's right, title, and interest in said lands. The action proceeded to judgment by confession against Baker for the sum of $38,401.04, entered December 12, 1884. Upon execution issued thereon, the sheriff, on January 10, 1885, sold said lands to John Satterfield, the plaintiff, for the sum of $6,430, and by his deed, acknowledged February 26, 1885, conveyed the same to Satterfield.

The bill charges that the deeds from Baker to Everett, although absolute in terms, were intended to be, and really were, mere mortgages to secure an indebtedness from Baker to Everett, or to a firm of which he was a member; that H. P Malone procured Everett to convey said lands to Emma E. Malone, through Mallory, who was a mere conduit of the title, with full knowledge on the part as well of H. P. and Emma E. Malone as of Everett himself that the conveyances by Baker to Everett were not absolute, but mere mortgages, and that the lands had been attached as the property of Baker, by Hilton & Waugh; that no consideration was paid for the lands by Emma E. Malone to Everett or Mallory, and that the latter paid no money and received none; and, finally, that the title claimed by Emma E. Malone under said conveyances is "wholly fictitious, fraudulent, and void in law."

In her answer to the bill, Mrs. Malone denies the allegation made therein that the deeds from Baker to Everett were mortgages; she explicitly denies that she had any notice or knowledge that they were otherwise than as they appear on their face, or that it was claimed that they were intended to be mortgages; she denies that she had any notice or knowledge of the foreign attachment at the suit of Hilton & Waugh; she denies every charge of fraud contained in the bill, and avers that she is a *bona fide* purchaser of said lands for value, without notice or knowledge, either of the claim that the deeds from Baker to Everett were mortgages, or of the pendency of the foreign attachment; she denies that her husband, H. P. Malone, acted for her in the transaction, or induced Everett to convey said lands; she admits that Lewis E. Mallory acted for her in the purchase of said property, and avers that he paid Everett for the property the sum of $20,000 in cash, which money was her own, and that Mallory himself was a *bona fide* purchaser, without any notice or knowledge that the deeds from Baker to Everett were intended to be mortgages, or of the pendency of the attachment suit of Hilton & Waugh. The plaintiff not having waived an answer under oath, Mrs. Malone's answer, which is under oath, and responsive to the bill, is evidence for her, and must prevail, unless it is overcome by the testimony of two witnesses, or one witness and corroborating circumstances which are equivalent in weight to the testimony of another witness. *Vigel* v. *Hopp*, 104 U. S. 441; *Morrison* v. *Durr*, 122 U. S. 518, 7 Sup. Ct. Rep. 1215.

In the treatment of this case I will first address myself to the inquiry whether, under the proofs, any actual bad faith is imputable to Mrs. Malone in this transaction. The main facts bearing upon this question, as established by the evidence, are these: Mrs. Malone was the adopted child of William Hart, of Cleveland, Ohio. In 1865, shortly

after her marriage, Mr. Hart gave, and conveyed to her a house and lot in the city of Cleveland, of the value of $20,000, which she sold a few years afterwards for $26,000 She then purchased and improved another property at a cost of $22,000, which she sold in November, 1873, for $43,000. At that time, undoubtedly, she had an estate in her own right of at least the amount last-named. Mr. Hart and Mr. Malone were then engaged in business as partners. Mrs. Malone loaned them money. They failed, and went into bankruptcy in 1875. They then owed her about $28,000, which she proved in bankruptcy, receiving a dividend of 25 per centum only. There is satisfactory proof that after Malone's discharge in bankruptcy he distinctly recognized his liability to his wife for the old indebtedness, and repeatedly promised her that he would pay it. She subsequently made him additional loans of considerable sums. Without going into further details, I content myself with saying that the proofs clearly satisfy me that in December, 1883, Mr. Malone justly owed his wife far more than $20,000.

In 1878 Mr. Malone went into the oil-producing business in McKean county, Pa., with George A. Baker; Malone superintending the putting down of wells and disposing of the product. The lands they operated upon (which included those in dispute) were purchased by Baker, and the title was in him; but by an unrecorded contract it was agreed that after Baker was reimbursed his purchase money, etc., he should convey an undivided share of the property to Malone. But it seems that Baker never was reimbursed, and he continued to hold the entire title. Baker, individually, and Baker & Malone, became largely indebted to Everett, Weddell & Co., bankers, of Cleveland, Ohio, of which firm Dr. Everett was a member. In 1880 that indebtedness in the whole much exceeded $300,000. On or about February 11, 1881, Baker and Dr. Everett sent Virgil P. Kline and W. L. Lord, from Cleveland to McKean county, with the two deeds dated November 20, 1880, already mentioned, from Baker to Everett, with instructions to put them on record, and take possession of the property for Dr. Everett; and this they did. Those gentlemen exhibited to Malone the deeds, and informed him that Baker had sold the property to Dr. Everett to liquidate the debt Baker & Malone owed Everett, Weddell & Co. Mr. Lord, who was then Baker's book-keeper, and who testified in this case for the plaintiff, speaking of what occurred at that interview, says:

"Mr. Malone made objection to it. He expressed great surprise at the 'summary proceeding,' as he called it, in closing up the firm. And he said he had no knowledge at all; supposed Mr. Baker was a very wealthy man, and was very much surprised at our coming down there, and taking possession of the property as we did; and Mr. Kline and I both labored with him a long while; and at last, by Mr. Kline, as the authorized agent of Dr. Everett, giving him a paper to the effect that he would be held harmless in the future, he consented to the transfer."

Mr. Lord further testified that both Kline and himself represented to Malone that the sale by Baker to Everett was absolute, and called "his attention to the fact that it would not begin to pay the indebtedness of

Mr. Baker to Everett & Weddell." The paper which Kline gave Malone was a release of his liability to Everett, Weddell & Co. for the indebtedness of Baker & Malone. Kline's testimony corroborates Lord's. After they had thus taken possession of the property, they employed Malone to superintend it for Dr. Everett, at a salary, and he continued so to act until the subsequent sale.

It appears that before Mrs. Malone came to Pennsylvania she had bought and sold several pieces of real estate. She moved to McKean county in the spring of 1880. Shortly afterwards she bought an oil property. This purchase she made through one Townsend, an oil operator She put down wells on that property, and then sold it at a profit of $7,000. It is shown that she had often spoken to Lewis. E. Mallory about buying an oil property for her. He was a near neighbor, engaged in the oil-producing business, and in buying and selling oil lands. In 1883, and prior thereto, Mr. Malone was speculating largely in oil, and was much on the floor of the Oil Exchange at Bradford. Mrs. Malone testifies that several times she had requested her husband to buy an oil property for her, and that he replied "that whenever I found a property that suited me, he was ready to pay me." She states that she considered the speculative business in which her husband was engaged as hazardous, and was afraid he might lose her money, and she adds: "I wanted it so that if anything happened to my husband I could take care of my parents and children."

In December, 1883, Dr. Everett employed C. D. Angell, a real-estate broker at Bradford, Pa., to sell the lands in controversy. Angell informed Mr. Malone that they were for sale, and could be bought for $20,000. No communication whatever had taken place on the subject between Dr. Everett and Malone, and the latter was surprised to learn from Angell that the property was for sale. Mrs. Malone was then in the city of New York, where she had been for several months. Mr. Malone wrote to her that the property was for sale at the price named, and that it would be a good purchase, and he inclosed her a check payable to her order for $20,000. Mrs. Malone wrote to Mr. Mallory to make the purchase for her, and sent him the check, indorsed payable to his order. Mallory saw Angell, and, without disclosing his principal, concluded the purchase in his own name. Dr. Everett's deed to Mallory, dated December 17, 1883, was brought to Bradford by John H. Webster, Dr. Everett's lawyer, and by him was delivered to Mallory upon his payment of the purchase money, $20,000. This money was the proceeds of the Malone check. A few days afterwards Mallory conveyed the property to Mrs. Malone. In this purchase Malone did not act as his wife's agent, or represent her at all. He did not participate in the negotiations. He took no part in the transaction whatever, except to inform his wife that the property was for sale, and would be a good purchase, and to send her a check for $20,000 to buy if she thought proper. That money honestly belonged to Mrs. Malone, and beyond any manner of doubt it was paid by her, through Mallory, to Dr. Everett for the property. The sale by Dr. Everett was not solicited or suggested by Mr. or Mrs. Malone. It was Everett's own volun-

tary act. He was anxious to sell, and was seeking a purchaser. The price was presumably fair, and the highest obtainable. Nothing to the contrary appears. At any rate, the sale was satisfactory to Dr. Everett. Of him it is here to be said that, whatever was the nature of his title, he, seems to have entertained no doubt as to his right thus to dispose of the property. In truth, the debt for which it was taken far exceeded its value. Furthermore, if the property was not taken in absolute payment thereof, then no part of that large indebtedness, or sum of $150,000, has ever been paid at all.

What foundation, then, is there for the charge that Mrs. Malone's title is "fictitious" or "fraudulent?" I have searched through the proofs in vain to discover any evidence to sustain such charge. Circumstances calculated to excite suspicion are not enough to establish fraud. *Morrison* v. *Durr, supra.* But even suspicious circumstances are wanting here. Mrs. Malone's employment of Mallory in this business she satisfactorily explains, if any explanation were needed. The property was offered for sale, and Mrs. Malone had a perfect right to buy, and to employ whom she pleased to act for her. That Malone himself kept aloof is a circumstance which is not prejudicial to his wife. In the course of his cross-examination, Malone having stated that he did "not want to be a purchaser of the property," and being asked why not? answered: "Because I was annoyed at the way they had undertaken to sell the property, and thought if I came in as a purchaser they would probably raise the price, thinking I knew more about it than any one else; and as they had not consulted me with reference to selling the property, I didn't want to have anything to do with it." In this, surely, there is nothing of which the plaintiff has any right to complain. Dr. Everett is not complaining, but is content with the sale. I may here add that I am quite unable to see that by reason of any relation which had existed between Malone and Baker, the former was precluded on any legal or moral ground from promoting the purchase of the property by his wife, or, indeed, from buying it himself. Upon this branch of the case my conclusion is that Mrs. Malone's title is free from any taint of actual fraud, and if it can be overthrown by the plaintiff it must be for some other reason.

This brings us to the question whether the deeds from Baker to Everett were absolute conveyances, as they purport to be, or mortgage securities, as the plaintiff asserts. The bill, upon information and belief, alleges that the agreement for reconveyance or defeasance was not reduced to writing, but was by parol, or, if in writing, was not recorded. It is certain that no such writing was ever recorded, nor has it or a copy been produced. In respect to its provisions, no witness undertakes to do more than give its bare substance as recollected. Baker testifies that in June, 1884, at the time of a settlement between him and Everett, Weddell & Co., he delivered the written defeasance to J. H. Webster. But, according to what I think is the weight of the evidence, that settlement was confined to so much of the indebtedness as was secured by mortgages on real estate in Ohio, and did not concern the Pennsylvania property at all. Mr. Webster, after diligent search, has not been able to find

such paper, and states that he has no knowledge of, and never saw it. Without undertaking to determine whether the defeasance agreement was reduced to writing, or rested in parol only, it is enough for me to say that I think the evidence does fairly show that originally said deeds were intended to operate as mere securities in the nature of mortgages. But the plaintiff's case has this most remarkable feature: that his own proofs, taken in chief, tend to prove that in February, 1881, Baker and Everett made a new agreement, whereby the conveyances became absolute, and that Baker signed a paper so stipulating.    The witnesses to show this are Mr. Kline, who was acting in this business as attorney for both Baker and Dr. Everett, and Mr. Lord, who was then in Baker's employ.    Mr. Kline testifies that a few days before their visit to McKean county, already referred to, "some papers were executed here in the city of Cleveland, and a settlement had, and basis fixed upon which the papers or the Pennsylvania property became absolute, as I recollect it."    This statement Mr. Kline made when testifying in chief.    Upon cross-examination he stated, with more positiveness, perhaps, that Baker signed a paper declaring that the deeds were absolute.    He further testified that the deeds were taken down for record as absolute conveyances, and he adds: "I showed Mr. Malone the terms upon which the property there had liquidated their liability."    Upon re-examination Mr. Kline adhered to the statement that Baker signed such a paper.    On this point Mr. Lord's testimony, though less full than Kline's, is corroborative of Baker's having signed such paper.    Mr. Kline states that the paper was delivered to George A. Berry, a lawyer of McKean county. Mr. Berry afterwards became insane.    His testimony was never taken. In view of Mr. Kline's professional relations to both the parties, is it likely that he is mistaken?    The attending circumstances, viz., the sending of the deeds to McKean county, the putting them on record, and the change of possession of the property, corroborate what Kline states as to the "settlement had," and the "basis fixed," whereby the "property became absolute."    Besides, no little weight is to be attached to the contemporaneous declarations made by Kline and Lord, the representatives of Baker, to Malone, that Baker had sold the property to Everett in liquidation of the debt owing by Baker and Malone.    Nor is the fact of the release to Malone, executed on that footing, without significance. It is true that George A. Baker contradicts very positively the statements of Kline, and testifies that the deeds continued to be what they were originally, mortgage securities; and perhaps there are some circumstances in evidence tending to corroborate him throughout.    But it is to be remembered that the evidence of an agreement and settlement by way of liquidation of the debt, under which the deeds became absolute, and the signing by Baker of a writing so declaring, was introduced into the case by the plaintiff, and did not come in by way of defense.

Now, under the pleadings, the burden of proof here is upon the plaintiff.    In *Lance's Appeal,* 112 Pa. St. 456, 4 Atl. Rep. 375, the court said:

"To convert a deed absolute on its face into a mortgage, by parol testimony, such testimony must be clear and specific, of a character such as will leave in

the mind of a chancellor no hesitation or doubt, and failing this, the effort to impeach the legal character of the deed must be regarded as abortive."

This rule, it seems to me, is applicable in its full force, here; and I think a chancellor, looking at the whole case, might well hesitate to declare the deeds from Baker to Everett to be mortgages.

But were it conceded that the evidence warrants such a decree, it would still remain for the plaintiff to show that Mrs. Malone, when she purchased, had knowledge or notice, express or constructive, that the deeds were mortgages, or of the pendency of the foreign attachment at the suit of Hilton & Waugh. Mrs. Malone not only swears in her answer that she had no such notice or knowledge, but she has so testified. That she had any actual notice or knowledge of the foreign attachment there is no evidence whatever. Nor is there sufficient evidence of her knowledge, or of any actual notice to her, that the deeds from Baker to Everett were mortgages, to overcome her answer. The evidence against her in this particular is weak and inconclusive; and, upon the whole, I am satisfied that she purchased in ignorance that said deeds were ever intended to be mortgages, or that it was so claimed. Mr. Malone has testified that he had no knowledge of the existence of the deeds until they were exhibited to him by Messrs. Kline and Lord, and no information as to their character, or as to the nature of the transaction between Baker and Everett, other than what he learned from the deeds themselves and the representations of Kline and Lord. The testimony of those gentlemen tends to corroborate Malone in this regard. Besides, is it likely that he would have sanctioned the investment of $20,000 in this property, had he known that the Baker deeds were simply mortgages? True, Mr. Baker testifies that he had so informed Mr. Malone. But, having regard to the entire proofs, I am not prepared to accept Mr. Baker's testimony as correct. I think the weight of the evidence is towards the conclusion that Mr. Malone had no knowledge or reason to believe that the deeds were otherwise than as they appear on their face. But after all, in this transaction Malone did not act as agent for his wife, and therefore his knowledge, if any he had, would not be imputable to her. And this remark is applicable to the matter of the foreign attachment.

But it is claimed that the testimony of Lewis E. Mallory, who was a witness for the defense, shows that he had knowledge that the Baker deeds were mortgages, and that his knowledge affects Mrs. Malone. The portion of Mallory's testimony, which, it is supposed, sustains this position, is as follows, the answers being made in response to questions in chief:

*Question.* "State whether or not, at the time you made this purchase of the property in controversy, you had any knowledge whatever that there was any claim against it, or any dispute as to the title? *Answer.* I hadn't the least knowledge in the world; not the least. *Q.* Did you know, or had you ever heard, that it was alleged that the deeds from George A. Baker to Everett were mortgages? *A.* I never heard anything of the kind. It was turned to Everett as security for money, as I understood it, and that by getting it from Everett we had it straight, without any incumbrance whatever. *Q.* Your information was, then, that it had been given to him for debts? *A.* Yes, sir;

as we frequently do here; that the banks will take a mortgage on the property, and hold it for the money; and I supposed this property had been put up with Everett for money, and got so far in that it couldn't be closed out; and I hadn't any idea that anything else could be against it. * * * *Q.* Did you ever know or hear, prior to the beginning of this suit, or since this suit was begun, that the deeds made from Baker to Everett were given for anything but money paid direct for them? *A.* No, sir; I never did. *Q.* Did you ever hear, prior to the commencement of this action, that anybody claimed that they had first been given as a pledge for money? *A.* I never did."

After Mallory's examination was closed, on a subsequent day, he was recalled by the defense before the examiner, and, his attention being directed to his second and third above-quoted answers, he testified that any information he had on that subject was acquired long after his purchase, and that at that time he had no knowledge nor any idea that the Baker deeds were mortgages, or anything of that nature. This re-examination of the witness took place without leave of court, and was objected to as not permissible under the equity practice. Without deciding whether or not this later testimony should be admitted, 1 will dispose of this part of the case without taking it into consideration.

Undoubtedly a principal may be charged with constructive notice by reason of his agent's knowledge. But the established doctrine in Pennsylvania is that, in order to so affect the principal it must be affirmatively shown that such knowledge was acquired by the agent in the course of the business in which he was employed for his principal. *Houseman* v. *Association*, 81 Pa. St. 256, 262; *Barbour* v. *Wichle*, 116 Pa. St. 308, 9 Atl. Rep. 520. The supreme court of the United States, indeed, in the case of *Distilled Spirits*, 11 Wall. 356, 366, stated the rule more broadly, holding the principal to be bound by his agent's knowledge, no matter when acquired; but with this important qualification: that the principal "is not bound by knowledge communicated to the agent, unless it be present to the agent's mind at the time of effecting the purchase;" and of this there should be "clear and satisfactory proof." Id.

As to what is sufficient notice to a purchaser of real estate of an unrecorded title, or adverse claim, the settled rule is that the information must come to him from some one who is interested in the estate, or from some authoritative source. Mere rumors are not notice, nor do they impose upon a purchaser the duty of inquiry. *Kerns* v. *Swope*, 2 Watts, 75; *Churcher* v. *Guernsey*, 39 Pa. St. 86; *Hottenstein* v. *Lerch*, 104 Pa. St. 460.

Bearing these legal principles in mind, let us now turn to the evidence relating to this matter. The plaintiff himself made no attempt to show that Mallory had any knowledge of the alleged defeasible character of the deeds from Baker to Everett. Nor was Mallory cross-examined at all upon this subject. So that the above answers contain the entire evidence tending to bring home to Mallory such knowledge, and thus to fasten constructive notice on Mrs. Malone. Now, there are no circumstances in the case indicative that Mallory possessed any information touching the dealings between Baker and Dr. Everett, or that he had any means of such information. They resided at Cleveland; he at Bradford. So far as appears, Baker and Everett were strangers to him. He had

had no connection, near or remote, with this property, or with the conveyances from Baker to Everett. His negotiations for the purchase were conducted at Bradford, occupying only a few days; and he was not brought in contact with any one who had knowledge that the deeds were mortgages, or were claimed so to be. As we have already seen, Mrs. Malone had no such information. Neither had C. D. Angell, with whom Mallory negotiated; at least there is not the slightest evidence that he had any. Angell states that Mallory inquired of Mr. Webster whether the title was good, and Webster assured him that it was, tracing the chain of transfers to some extent; and Mallory then decided to take the property. Mr. Webster confirms this; and he testifies that not one word was said about the deeds ever having been pledges or mortgages, and that at that time he himself had no knowledge that they were so, or that it was so alleged. The second and third above-quoted answers of Mallory, if considered alone, do not, I think, satisfactorily establish that, at the time he was acting for Mrs. Malone in this business, he had any definite information or clear conception in respect to the transaction between Baker and Everett. These answers are confused, and there seems to be an inconsistency about them. He starts out with the positive assertion, "I never heard anything of the kind;"—i. e., that it was alleged that the deeds from Baker to Everett were mortgages. If he had any information on the subject, the answers do not disclose how he acquired it, or from whom, or the extent of it, or that it was present in his mind when he made the purchase. The latter part of the second of these answers indicates that the witness was really giving utterance to his mere conjectures. "And I supposed this property had been put up," etc., is his language. But these two answers must be read in connection with those which preceded and followed. He previously had said that when he purchased the property he had not "the least knowledge in the world; not the least," that there was any claim against it, or any dispute as to the title. And at the last he most explicitly declares that prior to the bringing of the present suit he did not know and had never heard that the deeds from Baker to Everett were given for anything but "money paid direct for them," or that any one claimed that they had first been given as a pledge for money. To hold, then, Mrs. Malone chargeable with constructive notice by reason of anything contained in Mallory's above-quoted testimony would be to put an overstrained and unfair interpretation upon it as a whole. The burden of proof here, as in other particulars, is upon the plaintiff, and the answer must be overthrown. I am of the opinion that the proofs are insufficient to charge Mrs. Malone with either actual or constructive notice that the Baker deeds were mortgages.

Waiving the question whether notice at the time of the purchase of the pendency of the foreign attachment at the suit of Hilton & Waugh would have affected unfavorably Mrs. Malone's title, even upon the theory that said deeds were mortgages, let us now briefly inquire whether she is chargeable with constructive notice of the same. We have already seen that she had no actual notice of the attachment. Neither had

Mallory. It will be observed that the deeds from Baker to Everett were recorded in McKean county on February 12, 1881, and the suit of Hilton & Waugh was not commenced until more than three months later. The suit was for the recovery of a money demand against Baker, and was against him alone. The attachment was of Baker's right, title, and interest in the lands. Now, as Mrs. Malone is not claiming under any subsequent alienation or transfer by Baker, and had no dealings at all with him, the doctrine of *lis pendens* has no application whatever to the case. *Dovey's Appeal*, 97 Pa. St. 153. To affect with constructive notice even a subsequent purchaser of attached real estate from the defendant in a foreign attachment, it is necessary that a timely entry should be made on the judgment docket of the names of the parties, etc. 1 Purd. Dig. p. 825, pl. 16; *Ridgway's Appeal*, 15 Pa. St. 177. Here the proper entry was made (but not until May 22, 1881) in the name of George A. Baker. But this foreign attachment proceeding was not in the channel of Everett's title, nor connected with it; therefore a purchaser from Everett had no concern with it. A purchaser is not affected with constructive notice of anything which does not lie in the line of the title. *Woods* v. *Farmere*, 7 Watts, 382; *Hetherington* v. *Clark*, 30 Pa. St. 393; *Maul* v. *Rider*, 59 Pa. St. 167. In *McLanahan* v. *Reeside*, 9 Watts, 510, it was said by the court that a creditor, in the examination of a title, would of course stop at a conveyance absolute on its face, and referring to nothing beyond. "He would have no reason to suspect that further search would lead to a defeasance, of which, not lying in the channel of the title, he would not, though actually recorded, be bound to take notice." Id. So here Mrs. Malone, finding on record absolute deeds from Baker to Everett, was not bound to prosecute a later search. It follows then that constructive notice of the attachment is not to be imputed to her.

And now it only remains for me to declare as the judgment of the court, based upon a most careful consideration of the proofs, that in no view of the case permissible under the evidence is the plaintiff entitled to any relief.

Let a decree be drawn dismissing the bill, with costs.