. CAMPBELL v. THE FIRST NATIONAL BANK OF DENVER.

1. PRACTICE—WAIVER.

If a petition in intervention is subject to objection on the ground of uncertainty, the objection must be taken by demurrer. It is waived by answering over.

2. RESULTING TRUSTS.

Where all the money paid for locating and patenting a mine is contributed by one party and the title is taken in the name of another, it being the intention of both that the latter should hold it as trustee for the former, a resulting trust arises.

3. EXECUTED TRUST—FRAUD.

While the fact that the legal title to real estate was put in one to hold in trust for another, with intent to defraud the creditors of the beneficiary, might be available as a defense by the trustee to an action to establish the trust, yet where the trust has been declared and executed by delivering to the equitable owner a deed for the property, the principle has no application.

4. UNRECORDED DEED—NOTICE.

The rights of the holder of an unrecorded deed are superior to those of a creditor of the grantor, who, having notice of the conveyance, or of the facts equivalent to such notice, causes the property to be attached as that of the debtor.

5. PRINCIPAL AND AGENT—NOTICE.

A principal is not bound by the unofficial knowledge communicated to his agent, unless such knowledge was present in the agent's mind at the time of effecting the transaction.

*Appeal from the Court of Appeals.*

ON THE 3d day of September, 1886, the First National Bank of Denver brought its suit against Albert L. Johnson upon the latter's promissory note to the former in the sum of over nine thousand dollars, and in aid thereof sued out a writ of attachment, which, upon the 4th day of the same month, was levied upon an undivided one fourth interest in the Sierra Nevada lode, standing at the time on the records of Lake county in the name of said Johnson.

Thereafter, in this action, William L. Campbell filed his petition of intervention, claiming the attached property as

VOL. XXII—12

his own on the ground that the consideration therefor was paid·by him, though the title was taken in Johnson's name.

This petition of intervention was denied by answer of the plaintiff bank, and upon the issues of fact thus joined trial was had before the district court without a jury, which found in favor of the intervenor, and entered a decree establishing his right to the undivided one fourth interest in the property in question, and canceling the levy of the writ.

Upon an appeal from this judgment to the court of appeals, the decree of the lower court was reversed, and it is from the judgment of the latter court that the intervenor is prosecuting his appeal to this court.

The findings of fact made by the trial court, upon which its decree was based, are as follows :

"1. That said intervenor, William L. Campbell, advanced all the money by which the said one-fourth interest in the Sierra Nevada mining lode described in his petition of intervention herein was located and developed, and by which the title thereto was acquired, as alleged in his said petition.

"2. That the location of said mining property was made in the name of the defendant, Albert J. Johnson, at the suggestion of said intervenor ; that the title thereto was taken and remained in the name of said Johnson, and was conveyed to and remained in the name of Peter Campbell, and was again reconveyed to and remained in the name of said Johnson, until the same was finally conveyed to said intervenor, as alleged in said petition, and that said conveyances and reconveyances, and the holding of said property by Johnson and by said Peter Campbell, was with the free and voluntary acquiescence and consent of said intervenor, and there was no consideration whatever for any of said conveyances or reconveyances, except the moneys advanced by said intervenor as aforesaid ; and as between the said intervenor and the said Johnson and said Peter Campbell, the said intervenor was at all times aforesaid the sole and exclusive owner in equity of said one-fourth interest.

. "3. During the time between the original location and

acquisition of said mining property and the levying of the attachment thereon in this action, the intervenor exercised dominion and control over said one-fourth interest, sometimes in his own name and sometimes in the name of the party in whom the legal title was vested as aforesaid; but for something over two years prior to the levying of said attachment said mining property was not worked, and there was no actual possession thereof, no *pedis possessio*, by any one.

" 4. The deed of said one-fourth interest in and to said mining property executed and delivered to said intervenor by said Johnson, in December, 1885, was a good and valid conveyance, vesting in the intervenor all the right, title and interest to the property therein described which any other person or persons had theretofore had therein, so far as appears by this record and trial; but said deed was not recorded, nor filed for record, by said intervenor until after the levy of attachment in this action on said property.

" 5. The plaintiff, at the time of the levying of the writ of attachment in this action on said mining property, had no notice whatever of the existence nor of the execution and delivery of said deed, dated December, 1885, by which said Albert J. Johnson conveyed said one-fourth interest in and to said mining property to said intervenor. But the plaintiff did, at and before the time of the levying of said writ of attachment, have notice that the said intervenor had, or claimed to have, some interest is said mining property so levied upon, and had the means and opportunity of inquiring of the intervenor for definite information in respect thereto before making said levy."

Messrs. THOMAS, HARTZELL, BRYANT & LEE, for appellant.

Mr. CHARLES J. HUGHES, Jr., for appellee.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

At the threshold of this case, we are confronted with spe-

cific findings of fact made by the trial court, which were virtually set aside and held for naught by the court of appeals when this case was decided by it. The learned judge who wrote the vigorous opinion has stated the reasons for his conclusion in forcible and perspicuous language. The case is reported in the 2 Colorado Court of Appeals, 271.

As we read the decision, the intervenor's case was held bad in all its phases, *first*, because there was no proof of an agreement between intervenor and Albert Johnson, creating an express trust; *second*, because there was not sufficient proof of a resulting trust, and, if there were, the transfer by Johnson of the trust property to Peter Campbell, having been made in fraud of the federal statute (the object of the transfer being to defeat the jurisdiction of the federal court in threatened litigation between the owners of this and other mining property), and the subsequent conveyance by Peter Campbell back to Albert Johnson also being, as it is said, in fraud of the creditors of Peter, discharged the property of that trust, if it existed, and that the property then stood in the name of Johnson, relieved of all equities in favor of the intervenor, and just as if Johnson was then the legal and equitable owner of the property down to and including the day when the writ of attachment was issued; that therefore the rights of the intervenor and bank are to be determined, the one as the holder of a prior and unrecorded deed, the other as an attaching creditor;—and the ruling upon this branch of the case was that, under the decision of this court in *McMurtrie v. Riddell*, 9 Colo. 497, the rights of the bank were superior, inasmuch as there was no proof of notice to the bank, or its equivalent, of the alleged claims of ownership by the intervenor before the levy of its writ.

Unembarrassed by the decision of the court of appeals, our first impression, at least, upon reading the foregoing findings of fact made by the trial court would naturally be, under the rule of this court, that the decree establishing the rights of intervenor as superior, founded upon such findings, should be affirmed, if there were any legal evidence in

the record to support them.   A very careful examination of the entire record leads us to a conclusion, both as to the facts and as to some of the conclusions of law, different from that announced by the court of appeals.

While the petition of intervention contains an averment of an express agreement between Johnson and Campbell whereby a trust was created in this property, yet a fair construction of the entire pleading is that it sets forth a resulting trust in favor of Campbell of which the plaintiff bank had notice at the time of its levy of the writ of attachment when the property stood upon the records in the name of Johnson.   If, however, there was such uncertainty in the petition in this regard as that a demurrer upon that special ground would have been sustained, there has been a waiver by the bank of this defect by its answering over.

As there was no evidence in the case as to the existence of an express trust, but the evidence was directed towards the establishing of a resulting trust, it is only as to the latter that the evidence will be considered.

That the title to this property was taken in Johnson's name is conceded, and the evidence as to the other essential fact upon this phase of the case (the payment of the consideration by Campbell) is all one way.   Campbell positively swears that he paid the entire costs and expenses of making the location and securing the patent, and there is nothing to contradict his statement.   After the patent was obtained he paid all the costs for the development of the mine and of the litigation in which it was involved.   Of course, these subsequent payments do not constitute Campbell a beneficiary, any more than does the fact that prior to the location Campbell advanced to Johnson large sums of money, for which the latter was then indebted.   But as the latter facts are admissible upon the real issue, as tending to show the financial condition of Johnson to be such that he was not able to buy any property because he had no money, so, also, are these subsequent payments admissible as showing the acts of the parties

in relation to this property and as bearing upon their understanding as to who was the equitable owner.

We are satisfied from the evidence that all the money paid for locating and patenting this mine was contributed by Campbell, and that it was his money at the very time that title was taken in Johnson's name, and that it was then their intention that Johnson should hold it as trustee for Campbell. No authority need be cited to the effect that a resulting trust would thus arise, but *Warren v. Adams*, 19 Colo. 515, may be referred to as an instructive case as to this point. Indeed, if there was need of any proof of this resulting trust other than the uncontradicted testimony of Campbell, it is furnished by the evidence in this case showing the manner in which this property was managed and transferred from time to time.

At Campbell's request, Johnson conveyed it to Peter Campbell, a brother of the intervenor; Peter then conveyed it back to Johnson, and Johnson then conveyed it to the intervenor. Each of these conveyances was made at the request and direction of the intervenor, and there was no consideration for any of them, except the advances by William L. Campbell, and that all the parties recognized him as the owner and entitled to dispose of the property as he saw fit. That Johnson conveyed it to Campbell voluntarily and without any money consideration, is strong proof that he held the property as a trustee; and as between all these parties there seems to be no doubt that William was considered the owner. The contention that the transfer from Johnson to Peter Campbell, being made in fraud of the federal statute relating to the jurisdiction of the federal courts, and that the transfer from Peter back to Johnson, being made with the intention to defraud Peter's creditors, operated to discharge the property of the trust which theretofore existed in favor of intervenor, might be good had not the trust been executed. If this case were one wherein Campbell was seeking to declare a trust, while the legal title still remained in Johnson, and Johnson was resisting the same, these considerations

might be urged; but when the trust itself has been declared by Johnson, and he has executed the same, so far as he can, by delivering to the equitable owner a deed for the property, the principle sought to be urged here has no application. *Ownes v. Ownes et al.*, 23 N. J. Eq. 60.

Therefore we cannot agree with the court of appeals in its conclusion that a resulting trust was not shown; but we are satisfied from a very careful examination of the record that the first three findings by the trial court are correct. But, in our view of the case, we do not think it very material whether the evidence is sufficient to establish a resulting trust or not, for the unrecorded deed of Johnson to Campbell, under which the latter claims, if not given in execution of such resulting trust, we still think—considering the close relations existing between Johnson and Campbell, and the indebtedness of the former to the latter—that the conveyance by Johnson to Campbell was supported by an adequate and ample consideration.

This being so, the controversy here is between one who claims under the lien created by the levy of the writ of attachment, and one who claims under a prior, though unrecorded, deed. And so, whether we hold that a resulting trust in favor of the intervenor was established, or that he holds a valid unrecorded deed to the property, his rights in the one case are the same as in the other,—no better, no worse; for, if the plaintiff bank had no notice, or the equivalent of notice, of the equitable or legal rights of Campbell, its status as a valid incumbrancer by the lien of an attachment levy certainly cannot be better, but we shall assume that it is the same as that of a *bona fide* purchaser without notice, and that status makes its rights superior to those of a holder of a prior unrecorded deed. If, on the other hand, the bank had notice, its rights are subject to those of the intervenor. *Knox v. McFarran*, 4 Colo. 586; *McFarran v. Knox*, 5 Colo. 217; *McMurtrie v. Riddell, supra;* 1 Perry on Trusts, secs. 217–219, 239; 2 Perry on Trusts, sec. 828; 2 Lewin on Trusts, *869 *et seq.*

So the controlling question in this case is whether the bank had notice of intervenor's claim of ownership, or had knowledge of such facts as that, if diligent inquiry by the bank had been made, the result would have revealed to it knowledge of this prior unrecorded deed, or of intervenor's claim of ownership of the property.

The bank had no actual notice of the unrecorded deed, but the intervenor, whose rights are evidenced thereby, claims that the bank had knowledge of facts which should have disclosed to it knowledge thereof. The findings of the trial court under this issue upon somewhat conflicting evidence were with the intervenor. The court of appeals held that in law the evidence was insufficient to uphold the finding.

Testimony upon this branch of the case was given by the intervenor, by Peter Campbell (his brother), and by Mr. Moffat, who at all of the times mentioned in this action was the president of the plaintiff bank. It appears that prior to the levy of this writ, the intervenor, in December, 1883, had sold to Mr. Moffat the Louisville mine in Leadville, situate in the vicinity of this property, and when the deed of conveyance therefor was given it was executed by Peter Campbell, in whose name the title then stood, although Mr. Moffat knew that William was the owner. This fact, of itself, is not important, but in connection with other evidence it does throw some light upon this controversy. Campbell and Moffat were intimate friends for many years, and often talked over the former's business affairs and his property, and Moffat and the bank had loaned Campbell large sums of money.

Both before and after the sale of the Louisville mine, and down to a period of about one year before the attachment writ was levied (viz., in December, 1885), Campbell swears that he had different conversations with Mr. Moffat about his ownership of a one quarter interest in the Sierra Nevada mine, and at one time (in November or December, 1885) he testifies that he was talking with the late Senator Chaffee about the lease of intervenor's interest in this mine, for which Senator Chaffee was then negotiating, and that, though Mr.

Moffat took no extended part in the conversation, he was present and near enough to hear what was said.

Campbell further testified that after the sale of the Louisville mine to Moffat, he went to the latter on two or three occasions and tried to sell him his interest in this property; and that after the attachment was levied he had a conversation with Mr. Moffat in which the latter was told by him that he (Moffat) knew that the property belonged to intervenor, and ought not to have been seized for the satisfaction of Johnson's debt, to which Moffat in reply did not deny his knowledge as to Johnson's claim of ownership, but said that the suit was brought by the bank, and the bank found it in Johnson's name.

Peter Campbell testifies that in November or December of 1883, in a conversation which he had with Mr. Moffat concerning the subject of a sale of this property by the intervenor to Mr. Moffat, he told Mr. Moffat that his brother (the intervenor) owned this quarter interest in the Sierra Nevada mine, which was in Johnson's name, and that Johnson owned no interest therein, to which Moffat replied that " he was aware of it; said he knew Will owned the quarter; he said ' I know that.' " In the same conversation the witness testifies that he asked Mr. Moffat if the latter was not going to buy Will's interest in the mine, to which Mr. Moffat replied that, though he thought the mine a good one, he was not going to buy so small an interest in any mine.

As bearing upon the knowledge he had of intervenor's claim of ownership, the testimony of Mr. Moffat is significant. He says that he does not recollect the conversation between Senator Chaffee and the intervenor in 1885, to which the latter testified; although he admits that he had often told Campbell and others that Senator Chaffee could have money as long as he had any, which statement is part of the conversation which Campbell relates as having occurred upon this occasion. The bill of exceptions as to Moffat's testimony shows the following in this connection :

" Q. Did you know at that time whether the title [mean-

ing the title to the Sierra Nevada mine] was in Mr. Campbell or Mr. Johnson or whom? A. I didn't know *whom the title was in* until I got the deed. * * *

" Q. During this year whom the *title* was in? A. *No, sir.*"

Mr. Moffat denies altogether any recollection of the conversation between himself and Peter Campbell to which the latter testified, and says it never occurred. Further upon this point, in the direct examination of Mr. Moffat, we find the following:

"Q. I wish you would state to the court whether or not * * * on September 8, 1886, when this attachment was levied, you knew or had notice that Johnson was not an owner of an interest in the Sierra Nevada mine. A. At the time of the attachment?

" Q. Yes, sir. A. At the time the attachment was made I asked Mr. Buell—or just before the attachment was made —if he had got his lease. He said he had. I asked him who signed it and he said Albert Johnson. *When I got that information I immediately told Mr. Wood of it and he put on the attachment.* * * *

" Q. At that time or prior to that time had you had any notice from Mr. Campbell that Mr. Johnson was not in fact an owner, but that Campbell was? A. *1 never had any notice at all.*

" Q. At the time of your negotiations respecting the Louisville had the Sierra Nevada anything to do with it? A. Not anything."

It should be stated in this connection that Mr. Buell obtained a lease of this quarter interest in the property from Mr. Campbell, and was told by the latter that the title stood in the name of Johnson, and Johnson signed the lease.

The witness Moffat had been interrogated by his counsel concerning the sale of the Louisville mine, and on cross-examination the following occurred:

" Q. Any conversation concerning the Sierra Nevada take place? A. No, sir.

"Q. Did you know there was such a mine as the Sierra Nevada at that time?    A. I knew there was a mine up there, I don't remember that I took interest enough in it to know what the name was.

"Q. You knew it was a mine that W. L. Campbell was connected with?   A. I knew he had something to do with it, talked about it, I never remembered the name of it though.

"Q. He had talked with you and in your presence?   A. I heard him speak about it—Sierra Nevada or something like that.

"Q. Spoke of it as an owner?   A. *Spoke of it as an owner or interested party.*

"Q. Was that not before the attachment?   A. Yes, sir.

"Q. Was it after the purchase of the Louisville?   A. Yes, sir, I think so.

"Q. Can you state the occasions when he had these conversations, were they not as a matter of fact prior to the attachment?   You knew that Mr. Campbell claimed some interest in this property?   A. *He claimed some interest, yes, sir.* * * *

"Q. How long after the lease was signed before you asked Buell by whom the lease was signed?   A. I don't remember, it was one day here at the club, in the dining room.

"Q. You went and told Mr. Wood?   A. I told Mr. Wood that Johnson had signed the lease.

"Q. There was a claim in the bank of $9,000 and over against Johnson?   A. Yes, sir.

"Q. Didn't you ask that so as to find out whether the title stood in the name of Johnson, so that this attachment might immediately issue?   A. *No, sir; it surprised me when I heard it; I supposed that Mr. Campbell's brother here, Peter, had it.*

"Q. *You supposed that Peter held it for W. L.?*   A. *They had such a family way of doing things you couldn't tell.* * * *

"Q. Now, before that time didn't you suppose that the property belonged to W. L. Campbell, but that it stood in.

the name of Peter? A. *I didn't know whom it belonged to,* for I didn't pay any attention to it.

"Q. Didn't you know at that time? A. *I didn't know who held it.*

"Q. From your conversations with Mr. Campbell didn't you know that he claimed to own an interest in the Sierra Nevada mine? A. *No, sir, I did not; he may have said that he had some interest in it, but I didn't charge my mind with it.*

"Q. Didn't Mr. Buell tell you that he was negotiating with W. L. Campbell to get a lease on the Sierra Nevada mine? A. *No, he said he was negotiating with W. L. Campbell* and the other parties for a lease on the mine.

"Q. Didn't you understand that he was negotiating for W. L. Campbell's interest in the mine? A. *I supposed he was negotiating for whatever interest W. L. Campbell had.*"

Upon his reëxamination by his counsel Mr. Moffat testified as follows:

"Q. Up to the time that Mr. Buell told you that Johnson was a signer of the lease did you know that Johnson had an interest in the Sierra Nevada? A. I didn't know it at all, I supposed he had.

"Q. Did you know whether Campbell claimed that interest or any interest in it, did you know what interest he had? A. I did not at all.

"Q. And up to the time of the attachment you say you had no *notice* that this Johnson interest was not Johnson's? A. No, sir."

It will be seen that Moffat does not deny that he had with W. L. Campbell conversations concerning this property, and that Campbell claimed an ownership of the same, nor does he pretend at the time this attachment suit was brought that he had forgotten these conversations and what transpired thereat. He does deny that he had any *notice* that Johnson did not own an interest in the property, and denies that he then knew in whose name the property stood on the records. But his testimony will be searched in vain for a positive denial by him that he knew when the bank suit

was instituted that the intervenor claimed to own this quarter interest in the mine, and he does not claim that whatever knowledge he had previously acquired was not present with him at that time.

But if there was a direct conflict in the evidence upon this question, we could not sit as a jury to pass upon its weight or determine the credibility of the witnesses. That function belonged to the district court, and its performance we are not at liberty to annul, under the well and long established rule of this court that the finding of a court, like the verdict of a jury, will not be set aside unless there is a manifest insufficiency of the evidence, or some improper motive governed the court.

It has been ruled in this court, in *Armstrong v. Abbott*, 11 Colo. 220, that the principal is not bound by the unofficial knowledge communicated to the agent, unless such knowledge is present to the agent's mind at the time of effecting the purchase, and upon this principle it is urged that the notice to Mr. Moffat did not bind the bank. This case, in turn, was based upon *The Distilled Spirits*, 11 Wall. 356, wherein it is said:

"In England the doctrine now seems to be established, that if the agent, at the time of effecting a purchase, has knowledge of any prior lien, trust, or fraud, affecting the property, no matter when he acquired such knowledge, his principal is affected thereby. If he acquire the knowledge when he effects the purchase, no question can arise as to his having it at that time; if he acquired it previous to the purchase, the presumption that he still retains it, and has it present to his mind, will depend on the lapse of time and other circumstances. Knowledge communicated to the principal himself he is bound to recollect, but he is not bound by knowledge communicated to his agent, unless it is present to the agent's mind at the time of effecting the purchase. Clear and satisfactory proof that it was so present seems to be the only restriction required by the English rule as now understood. With the qualification that the

agent is at liberty to communicate his knowledge to his principal, it appears to us to be a sound view of the subject."

Mr. Moffat, at all times covered by the evidence, was president of the bank, and as such, of course, its agent. At different times, from a period extending from three years down to ten or eleven months prior to the levy of the writ of attachment, the intervenor had frequently told Mr. Moffat of his ownership of this property, and this is not denied. Notice of the state of the title on the record is denied, and there is a denial of notice of claim of ownership, but the facts which, in law, constitute notice, or what is equivalent thereto, are not denied by Mr. Moffat, and a mere denial of a conclusion of law is not a denial of the facts which support such conclusion. These facts as to Campbell's claim of ownership Mr. Moffat knew, though he did not acquire the knowledge at the time of beginning the attachment suit, but before that time. Whether he still retained the knowledge thereof was the subject of inquiry upon the trial. If he did retain such knowledge, then, as the agent of the bank, the latter was charged with such notice, although the agent theretofore gained such information in the transaction of his own private business.

Under all the circumstances of this case, we must affirm the judgment of the trial court if there is legal evidence to sustain it. However great the conflict may be, we cannot substitute our own for the judgment of the learned judge who tried the case, saw the witnesses, heard them testify, and observed their bearing upon the witness stand, unless it is made to appear that the judge misconceived the legal effect of the evidence, or that the findings are manifestly against the weight of the evidence, or that passion or prejudice controlled the court's decision. These issues of fact were tried by the court below, and its judgment, having evidence to support it, under the established rule of this court, must stand, when, as in this case, there is present no element of viciousness, as just stated.

Upon the findings of fact the equities here seem to be with the intervenor. There is no claim that credit was extended to Johnson by the bank by reason of the fact that the record showed him to be the owner of this property, but, on the contrary, when Mr. Moffat, as the agent of the bank, learned that this interest in the property stood upon the records in the name of Johnson he was surprised, and at once this attachment suit was brought.

The bank, having knowledge of facts which, upon further inquiry, would have resulted in the knowledge of the existence of intervenor's unrecorded deed, its rights, depending solely upon the lien of the levy of the attachment writ, are inferior to the rights of the intervenor under his unrecorded deed.

The judgment of the court of appeals is, therefore, reversed and the cause remanded with instructions to affirm the judgment of the district court.

*Reversed.*