## STATE BANK OF MORTON v. FRANK E. ADAMS AND ANOTHER.[1]

February 21, 1919.

No. 20,904.

**When bank is chargeable with knowledge of officer.**

    1. A bank is chargeable with knowledge of facts known to an officer transacting its business, even though the officer is himself interested, if he is the sole representative of the bank in the transaction.

**Bills and notes — actual notice to indorsee of infirmity of note.**

    2. Notice to an indorsee of the infirmity of a note must be actual and not constructive.

**When bank is chargeable with knowledge of officer.**

    3. A bank is chargeable with knowledge acquired by its active officer, even though acquired in another transaction, if it appears that the knowledge is actually present in his mind while he is acting for the bank.

**Same — question for jury.**

    4. In this case the president of an indorsee bank had knowledge of such facts that a jury should be permitted to determine whether he was chargeable with notice of fraud in the inception of the note.

**Bills and notes — bad faith of indorsee — evidence — question for jury.**

    5. To constitute notice of an infirmity in the instrument the indorsee must have had actual knowledge of the infirmity or knowledge of such facts, that his action in taking the instrument amounted to bad faith. Wilful ignorance or gross negligence is evidence of bad faith. The question of what is bad faith is usually a question for the jury.

    Action in the district court for Kandiyohi county to recover $2,100 upon a promissory note. The answer alleged the facts which defendants offered to prove at the trial (see first paragraph of the opinion), interposed a counterclaim for $2,500 and demanded delivery and cancelation of the note. The case was tried before Qvale, J., who at the close of the testimony granted plaintiff's motion for a directed verdict for

[1]Reported in 170 N. W. 925.

$2,580.40. From an order denying their motion for a new trial, defendants appealed. Reversed.

*R. B. Brower* and *R. W. Stanford,* for appellants.

*John A. Dalzell,* for respondent.

HALLAM, J.

November 20, 1913, defendants, farmers near New London, Minnesota, gave their note for $2,100 payable 90 days after date to the Sterling Securities Corporation. On December 18, 1913, the Securities Corporation indorsed and delivered the note to plaintiff. Plaintiff sued and defendants defended on the ground that the note was fraudulent in its inception, and that plaintiff was chargeable with notice of that fact. On the trial defendants offered to prove that the note was procured by D. R. Morrow, an agent of the Securities Corporation; that Morrow represented that the Securities Corporation was organizing a bank at New London; that the transaction was a subscription by defendants for stock in the bank, and that defendants would receive bank stock to the amount of their note; that the organization of the bank was practically complete; that the Securities Corporation had previously organized 14 banks in Minnesota and North Dakota and that they were going concerns; that defendants were induced by these representations to give this note; that the representations were altogether untrue, and that the Securities Corporation had by the same fraudulent representations obtained money or notes or property from persons residing in New London and vicinity amounting in all to more than $50,000.

The court rejected this proof, on the ground that the evidence conclusively showed that plaintiff was a bona fide holder for value and without notice of the fraud, and directed a verdict for plaintiff. The propriety of this ruling is the question presented on this appeal.

There is no claim that the bank or any of its officers had actual knowledge of the alleged fraud, but it is contended that plaintiff's president had knowledge of facts sufficient to put plaintiff on inquiry, and that slight inquiry would have disclosed the fraud. We are of the opinion that the question whether plaintiff was chargeable with notice of the fraudulent character of the note should have been submitted to the jury.

The essential facts relied on to charge plaintiff with notice are as follows:   The Sterling Securities Corporation was a holding corporation doing business at Minneapolis, Minnesota.   It was a thoroughly corrupt and irresponsible "promoting concern" and "stock selling concern."   Its stock was sold largely by an agent who received a commission of 40 per cent.   It promoted and fostered a chemical company, a furniture company, and a laundry.   It proposed to found and operate a string of country banks, itself to own 51 per cent of the stock, and its agents to sell the balance of the stock, but no bank was ever organized.   Business was not done on business principles, and the concern was soon hopelessly bankrupt.

F. W. Orth, president of plaintiff bank, became a stockholder in the Securities Corporation in 1911.   At that time he bought $100 of stock. July 24, 1912, he bought $150 more.   July 31, 1912, $100 of stock was issued and given to him to compensate him for acting on the so-called "advisory board" of the corporation, and he served on this board.   The functions of this "advisory board" do not clearly appear, but it held meetings in Minneapolis.   Mr. Orth attended one meeting in April, 1913, and he also speaks of a "next meeting."   Either at one of these meetings or "in February," the plan of organizing country banks was discussed, and it was talked that there was an opening for a bank at New London, and one at Echo, Minnesota.

On July 15, 1913, Mr. Orth bought $500 of stock through D. R. Morrow, the corporation's selling agent, and at the time received back this agreement in writing: "This is to certify that I hereby agree to re-sell 500 shares of the Sterling Securities Corp. stock at $1.50 per share from Nov. 1st, 1913, to Jan. 1st, 1914.   Sterling Securities Corp. Per D. R. Morrow, Exec. Agent."

On November 15, 1913, Mr. Orth wrote Morrow "wish you would sell the 500 shares of your stock that I subscribed for at $1.50 per share according to your agreement of July 15th, 1913."   Some correspondence followed, and on December 16, 1913, Mr. Orth wrote the Sterling Securities Corporation.

"I have deferred answering your letter in the hopes that something would turn my way so I could keep the stock I subscribed for but I

can't see my way clear so please let your Mr. Morrow sell it according to the agreement."

On the following day there was a telephone conversation between Mr. Orth and James J. Wise, president Sterling Securities Corporation, negotiating for the sale to plaintiff bank of the note here sued on and a note of A. M. Anderson, and it was arranged that, if plaintiff bought the notes, Mr. Orth "was to keep out the $750" guaranteed to him by his contract of July 15. On the same day the Securities Corporation wrote "F. W. Orth, President" of the "State Bank of Morton," a letter "confirming" the telephone conversation, inclosing the notes, stating that defendant's note was given for stock in the Securities Corporation, stating that defendants were of New London, Minnesota, and that Anderson was "a prosperous farmer, living near Hawick," a small village in the vicinity of New London, offering discount so as to make the paper net 10 per cent interest, and authorizing a deduction from the purchase price of the notes of "$750, the amount Mr. Morrow agreed to secure * * * from the sale of the stock." On the same day a second letter was written by the Securities Corporation to "Mr. F. W. Orth, Morton, Minnesota," stating: "It seems impossible to get any of this money in just at present. We never make a practice of indorsing paper * * * yet in this case, if you will favor us, we will guarantee the payment of these notes, and in turn will favor you by relieving you of the 500 shares of stock. In case there is any reason why you cannot adjust the matter in this way, kindly call us by phone, as early to-morrow as possible, as we need this money to pay the contractor who is finishing the bank building at Echo, Minnesota."

On receipt of these letters and of the notes, Mr. Orth directed the cashier of plaintiff bank to find out if the notes were good. The cashier called a New London Bank by phone, found that the makers were good, so reported to Mr. Orth and Mr. Orth closed the transaction. He drew the bank's draft payable to the Securities Corporation for the amount of the notes, less the agreed discount, and less the amount of his $750 claim. He wrote a letter to the Securities Corporation, in the name of the bank, containing a statement of the transaction and returned the stock assigned in blank. He made out a deposit slip, depositing the 750 to his credit in plaintiff bank.

On November 13, 1913, nine suits had been commenced against the Sterling Securities Corporation to recover about $10,000, though no papers were filed until some months later. It was two days after these suits were commenced that Mr. Orth started the correspondence looking towards the redemption or resale of his stock. Orth said he did not know of these suits at this time, and there is no evidence that he did, but when asked if he had then heard of the trouble that Sterling Securities Corporaton was having he answered: "I don't know but I had."

The question whether plaintiff had notice of the fraud practiced by the Securities Corporation in procuring defendant's note resolves itself into two: First, was plaintiff bank chargeable with the knowledge possessed by Mr. Orth, its president? And second, if so, were the facts of which Mr. Orth had knowledge sufficient to constitute notice?

1. As to the first proposition the trial court ruled that plaintiff bank was chargeable with knowledge possessed by Mr. Orth. In this the trial court was right. Orth settled this question as far as he could do so when he said he "was acting 2300 dollars worth for the bank and 750 dollars worth for" himself. Orth conducted the bank's end of this negotiation. He was its controlling agent from beginning to end.

A bank is chargeable with knowledge of facts known to an officer transacting its business and pertaining to matters within the scope of its business. This doctrine is based on the ground that it is the duty of the officer to communicate his knowledge to the bank, and it is to be presumed that he has performed this duty. Woodworth v. Carroll, 104 Minn. 65, 68, 112 N. W. 1054, 115 N. W. 946. The rule of imputed notice does not apply, where the officer whose knowledge is sought to be imputed to the corporation is himself interested, and does not act for the corporation, but is connected with the transaction only in an adversary capacity, Bang v. Brett, 62 Minn. 4, 6, 63 N. W. 1067; First Nat. Bank of West Minneapolis v. Persall, 110 Minn. 333, 125 N. W. 506, 675, 136 Am. St. 499; First Nat. Bank of Gilbert v. Bailey, 127 Minn. 296, 149 N. W. 469, for in such case it is to his own advantage not to impart his knowledge to the bank, and it is not to be presumed that he does so. But there is no room for the application of this exception, where the officer interested is the sole representative of the bank in the transaction. In such case his knowledge is the knowledge of the bank.

First Nat. Bank v. Blake, 60 Fed. 78; Smith v. Mercantile Bank, 132 Tenn. 147; First Nat. Bank v. Burns, 88 Oh. St. 434, 103 N. E. 93, 49 L.R.A.(N.S.) 764; Ditty v. Dominion Nat. Bank (C. C. A.) 75 Fed. 769, 22 C. C. A. 376; Holden v. New York & Erie Bank, 72 N. Y. 286; Black Hills Nat. Bank v. Kellogg, 4 S. D. 312, 56 N. W. 1071; Steam Stonecutter Co. v. Meyers, 64 Mo. App. 527; First Nat. Bank v. Town of New Milford, 36 Conn. 93; Loring v. Brodie, 134 Mass. 453; First Nat. Bank v. Dunbar, 118 Ill. 625, 9 N. E. 186. We hold that notice to Orth was notice to plaintiff bank.

2. The next question is, had Orth notice of the infirmity of this paper? The notice must be actual, not constructive. The mere fact that Orth was a stockholder of the Securities Corporation or a member of its advisory board, is not sufficient to charge him with notice. First Nat. Bank of Rock Island v. Loyhed, 28 Minn. 396, 399, 10 N. W. 421.

3. We find such general statements in the books as that it is necessary that the knowledge should have come to the officer in his official capacity, Merchants' Nat. Bank v. Clark, 139 N. Y. 314, 34 N. E. 910, 36 Am. St. 710; that it should be gained during the course of business in which he is employed, Satterfield v. Malone, 35 Fed. 445, 1 L.R.A. 35; that notice of facts to an officer of a bank is not notice to the bank if it is received by the officer in conducting the business of another company. Washington Nat. Bank v. Pierce, 6 Wash. 491, 33 Pac. 972, 36 Am. St. 174. But the fact is, it is impossible to distinguish between the knowledge which a bank president possesses as an officer and as an individual, Second Nat. Bank of St. Paul v. Howe, 40 Minn. 390-393, 42 N. W. 200, 12 Am. St. 744, and the very tangible and workable rule has been established in this state that a bank is chargeable with knowledge possessed by its active officer pertaining to transactions within the scope of the bank's business even though such knowledge is acquired in another transaction, if it appears that the knowledge is actually present in his mind while he is acting for the bank. Lebanon Savings Bank v. Hollenbeck, 29 Minn. 322, 13 N. W. 145; Wilson v. Minnesota F. M. Fire Ins. Assn. 36 Minn. 112, 30 N. W. 401, 1 Am. St. 659; Campbell v. First Nat. Bank, 22 Colo. 177, 43 Pac. 1007; Red River Valley Land & Inv. Co. v. Smith, 7 N. D. 236, 74 N. W. 194; Shafer v. Phoenix Ins. Co. 53 Wis. 361, 368, 10 N. W. 381. It may not al-

ways be easy to determine what knowledge, acquired elsewhere, a bank officer may have in mind while he is transacting the bank's business, but we think this rule will in general prove a practicable rule, and surely in this case a jury would be justified in inferring that Orth had present in mind substantially the facts which are herein stated, most of which are derived from his own testimony.

4. While there was no evidence that Orth knew of all the disreputable methods pursued by the Securities Corporation, he did know that the Securities Corporation was a promoting and stock selling concern. He knew it was fostering such diverse and disconnected industries as a chemical company, a woodworking establishment and a laundry. He knew the corporation was in very urgent need of money to help foster these enterprises. He knew it had not the ready money to take up this stock and was finding it impossible to get any money "just at present" and that it was offering special inducement to cash these notes. He knew there had been talk of organizing a bank at New London and one at Echo, and that it was part of the plan in such cases for the corporation to sell the bank stock in the bank's locality. He knew these notes were the notes of New London people. The corporation informed him that the note of defendants was given for a subscription to capital stock, and he could see that the corporation was diverting it from the legitimate use of capital to the payment of a very large personal profit to himself, a profit that netted him a return at the rate of 120 per cent a year. As a plain matter of fact it must then have been apparent to him as a banker, that the contract, made by him with this corporation, still in the stock selling stage, never was a legitimate business transaction nor one for the redemption of which it could properly use corporate funds. Manifestly no such profits were being made. We think the knowledge he had was such that a jury should be permitted to decide whether he was chargeable with the duty of further inquiry, or, in other words, with notice of the alleged fraud in the procurement of this note.

The statute says that "to constitute notice of an infirmity in the instrument * * * the person to whom it is negotiated must have had actual knowledge of the infirmity * * * or knowledge of such facts that his action in taking the instrument amounted to bad faith." G. S. 1913, § 5868. This is not different from the rule that obtained before

the enactment of the statute. Drew v. Wheelihan, 75 Minn. 68, 72, 77 N. W. 558. Bad faith in these transactions is based upon a variety of circumstances. Guilty knowledge and wilful ignorance alike involve the result of bad faith. Gross negligence although not in itself bad faith as a matter of law is evidence of bad faith and the question of what is bad faith is usually a question for the jury. Drew v. Wheelihan, 75 Minn. 68, 72, 77 N. W. 558; Collins v. McDowell, 65 Minn. 110, 67 N. W. 845. It is in this case.

Order reversed.