## NATIONAL BANK OF OSHKOSH v. MUNGER.

### (Circuit Court of Appeals, Seventh Circuit. June 6, 1899.)

### No. 497.

1. AGENCY—RESPONSIBILITY OF PRINCIPAL FOR ACTS OF AGENT—AGENT ACTING FOR DIFFERENT PRINCIPALS.

A depositor in a bank authorized the teller to act as her agent in making and collecting loans, but he was not authorized to draw money from her account, except on checks procured from her. The arrangement was continued for a number of years, during which she gave several hundred checks, aggregating over $90,000. During the same time, without the authority or knowledge of the depositor, the bank permitted the teller from time to time to withdraw money from her account on a "teller's memorandum," which was merely a direction to the bookkeeper to charge her account with a stated sum, and such sums he appropriated to his own use. Held, that in such transactions the teller acted in his capacity as an officer of the bank, and not, so far as the bank was concerned, within the apparent scope of his agency for the depositor, and that the bank was liable to her for the amounts so withdrawn.

2. SAME—RATIFICATION.

The making of a note by the teller in favor of the depositor, which he placed with her securities in the bank, without her knowledge, and upon her merely expressing her willingness to make him a loan on security, when in fact no loan was made and no check was given by her, but the money had previously been wrongfully taken from her account, could not operate to bind her, as a ratification of such withdrawal, nor relieve the bank from liability to her therefor.

3. SAME—UNAUTHORIZED PAYMENT TO AGENT.

A bank which permits an agent of a depositor to have money transferred from the depositor's account to the credit of a concern which it knows the agent to be chiefly interested in is chargeable with knowledge that he cannot bind his principal in such a transaction, and acts at its peril.

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin. ·

This suit is brought by Harriet E. Munger, the defendant in error, to recover of the National Bank of Oshkosh, the plaintiff in error, a claimed balance of $14,435.06 of moneys deposited to her account in that bank. Prior to the 1st day of March, 1891, she had a deposit account with the bank, and on that day had a balance to her credit of $822.35. She is the daughter and sole heir at law of Jefferson Bray, deceased, and on April 8, 1891, his executors deposited in the bank to her credit the sum of $23,439.49, and delivered to Frank Heilig, who was, and for 20 years had been, the paying and receiving teller of the bank, a box containing the securities of the estate, and which then belonged to the defendant in error. This was done at her request, she having engaged Heilig as her agent to attend to her estate and to make loans for her. At about that date the cashier of the bank asked her who was going to do her business, and she said Mr. Heilig, that her father had confidence in him, and that she intended to intrust him with her affairs. Heilig kept the box in the vault of the bank, no one but himself having access to it. The defendant in error resided at Oshkosh, in which city the bank was located, until the autumn of 1894, when she removed to the city of Chicago. The custom in the transaction of this business was that Heilig, when he made a loan for her, obtained her check upon the bank for the amount of the loan; and several hundred checks so procured, and signed by her, and aggregating in amount over $92,-000, are produced in evidence. He had no authority from Mrs. Munger to draw upon her bank account, except upon checks signed by her. Soon after his agency commenced, and from time to time during the six succeeding years, he drew moneys from the bank, delivering to the bookkeeper of the bank memoranda called "teller's memoranda," which were directions to the book-

keeper to debit Mrs. Munger's account with the moneys stated thereon, and so taken by him. The claim in suit is properly divisible into three classes:

First. The amount taken by Heilig from the bank and appropriated to his own use, for which debit memoranda were made by him and delivered to the bookkeeper, and without check or voucher, or authority from Mrs. Munger. This amount is stated by the court below, and by counsel in this court, to be $13,080.35, while the notes of Heilig, representing the amount abstracted, and which were placed by him in the box containing Mrs. Munger's securities, foot up $13,183. No part of this amount was ever paid to Mrs. Munger, or in any way inured to her benefit. With respect to $5,000, part of the amount, the evidence disclosed that after its appropriation, and without knowledge of it by Mrs. Munger, Heilig, about October 2, 1893, asked her if she would loan him $5,000 upon timber lands, not mentioning where or what they were, and she expressed her willingness to make such loan. Thereupon, without further communication with Mrs. Munger, and without her knowledge, Heilig signed, and placed in the box of Mrs. Munger's securities at the bank, his note for $5,000, dated October 2, 1893, to the order of Mrs. Munger, payable at the National Bank of Oshkosh on or before five years after date, with interest at 6 per cent. per annum. This note contains this further statement:

"Having deposited with the National Bank of Oshkosh certain property (as stated below) as collateral security to this note, for value received I hereby authorize said bank, on the nonpayment of this note at maturity, to sell said property at either public or private sale, with or without further notice to me, and apply the proceeds thereon:

Lands in Michigan, hardwood.
Do  " Minnesota,   pine."

Indorsed upon the note was the following:

"Southwest quarter section 29, town 60, range 18, Minnesota. Contains 3,200,000 ft. of pine. I own ½ interest. Taxes paid for 1893."

No money was taken upon this note. It was so made and deposited by Heilig to represent so much of prior defalcations.

Second. The sum of $2,665 taken from the bank by Heilig upon like debit memoranda, and disposed of as follows: (a) Wall and Spaulding loan, January 9, 1893, at six months, $1,000. Heilig states that this loan was repaid, but he was unable to say whether Mrs. Munger's account was credited with the amount. The bank book shows that it was not. (b) Loan to Arthur C. Payne June 30, 1894, $100; November 1, 1894, $300,—charged in the bank book to Mrs. Munger's account. It is not possible from the record to reconcile or account for the singular entries respecting this loan. On January 13, 1896, Mrs. Munger's bank account is credited "$160, A. C. Payne," and on March 12, 1896, the account is charged with "$217.67, note A. C. Payne," while the notes of Payne found in the box are dated August 25, 1894, for $300, and June 26, 1896, for $100, and on June 16, 1895, Heilig reported a loan to A. C. Payne of $200. (c) Loans to Pearson Refrigerator & Cold-Storage Company. These loans were all made in the year 1896, as follows: May 11, $350; June 4, $300; August 4, $300; September 5, $115; September 26, $200; total, $1,265. Notes of the company were taken, and placed in the box of Mrs. Munger's securities, bearing the dates stated, each payable one year after date to the order of Mrs. Munger. In this transaction Heilig assumed to act both for Mrs. Munger and for the corporation, in which he was one of the chief parties interested. These loans were made by Heilig after he had severed his connection with the bank, and were done in this way: In each case he made a memorandum, not signed, directing the amount to be credited to the Pearson Refrigerator & Cold-Storage Company, and to be charged to Mrs. Munger, delivering them to the bookkeeper, who made entries accordingly in the books of the bank. Heilig states that no one but an officer of the bank ever makes such memoranda, and that no money is ever paid to an outsider upon a memorandum debit, and that he had free access to the bank after he had left its service. Neither of these loans have been paid, nor had Mrs. Munger any knowledge of them.

Third. The sum of $75 withdrawn on July 24, 1896, from the bank by Heilig upon a like debit memorandum, for his own use, without check or voucher from Mrs. Munger, after he had left the service of the bank, and charged to Mrs. Munger, in the bank book, as loaned under the name of "Ad. Domingo."

It should be noted that the total of all these amounts is $15,820.35,—an excess of $1,385.29 over the amount claimed, $14,435.06, to which sum, with interest, the recovery of the plaintiff below was limited by the court.

The record states that in the autumn of 1894, just previous to Mrs. Munger's removal to Chicago, Heilig had an interview with her at her home, and he says: "Took the box containing bank books, with whatever belonged in it,—the plaintiff's papers. We then and there looked over the plaintiff's matters. Cannot remember whether rendered her a statement. That he knows that they looked over the contents of the box. Exhibit R2 is a statement he furnished the plaintiff. Cannot state when he furnished it. The pencil mark on exhibit R2 my handwriting. S2 is in his handwriting, including the pencil mark on the same. That he made and furnished it to the plaintiff before the plaintiff went to Chicago." On cross-examination, Heilig stated that Mrs. Munger must have seen his note (referring to the $5,000 note). "I compared at her house before she went to Chicago, and each individual note was taken out; * * * checked them up."

There were three statements produced in evidence,—Exhibits R2, S2, and T2. The latter, on its face, refers to receipts and expenditures in the year 1895, and could not have been the statement referred to by Heilig. There is some uncertainty in the evidence respecting which statement was given to Mrs. Munger by Heilig before the former removed to Chicago. The court, in its charge, said that it was not claimed that there was proof of the actual delivery of Exhibit R2 to Mrs. Munger at that particular time, except as it might be determined from the appearance of the paper itself, and left the matter to be determined by the jury. Exhibit R2 contains a statement of Heilig's note for $5,000. Exhibit S2 does not, although it refers to notes of subsequent date. The latter exhibit is manifestly prior in time to the former. Exhibit R2 at the foot, contains a statement in pencil by Heilig of receipts and expenditures, as follows:

Receipts.
Int. Rec. from Jany 1st, 94

| | | |
|---|---|---|
| | to Oct 1st | 2477.97 |
| | " 2, Otis | 420. |
| | Timmerman | 120. |
| | Milwaukee | 73.50 |
| | Jany 1st 94 | 3091.47 |

Expenditures.

| | | |
|---|---|---|
| Taxes | 289.29 | |
| Mrs. Munger to Sept. 18 | 1450. | |
| | | 1739.29 |
| | | 1352.18 |

In pencil on the statement, and in the handwriting of Heilig, is the following:

| | |
|---|---|
| 2000 Beideman | |
| 2300 D. L. Miller | Notes del'd to |
| 12000 Harry & John Munger | Mrs. Munger. |
| $16800 | |

The record discloses that Exhibits R2 and S2 were introduced in evidence by the bank, but from whom they were obtained does not appear by the record. Certain other exhibits, being letters from Heilig to Mrs. Munger, were produced by her. The court, in its charge to the jury, assumed that a statement was produced at the trial by Mrs. Munger, but did not, nor does the record,

identify the one produced. She testified that, before she left Oshkosh for Chicago, Heilig brought the box to her; that she did not personally examine the papers; that he gave her what was supposed to be a memorandum of the contents at that time. She thought it to be one of the papers produced, but did not identify the statement. Mrs. Munger stated that, being about to remove to Chicago, she instructed Heilig that no more loans should be made by him, and that as the loans were paid the principal should be sent to her at Chicago; that she took some notes with her, leaving with Heilig those payable in Oshkosh; and that she had no knowledge of any loans being made by Heilig without her first signing checks therefor. She went abroad in July, 1896, and was absent until December of that year. Upon her return she promptly repudiated and declined to receive all notes signed by Heilig found in the box, and also the notes representing loans to the Pearson Refrigerator & Cold-Storage Company and loans to Arthur C. Payne.

At the trial the court directed a verdict in favor of the plaintiff below for the amount withdrawn by Heilig for his own use, except the sum of $5,000 claimed as a loan, and the $75 withdrawn after Heilig had left the service of the bank. The court submitted to the jury the question whether the $5,000 of the money appropriated by Heilig to his own use was or became a loan from Mrs. Munger, and also whether Heilig was authorized to draw the $75 upon her account. For the sum of $1,265, purporting to be loaned to the Pearson Refrigerator & Cold-Storage Company, the court directed the jury to find a verdict for the plaintiff below; and concerning the other amounts, to wit, the Wall & Spaulding $1,000, and the Payne loans, stated at $400, the court submitted to the jury the question of Heilig's authority to withdraw the moneys for the purpose of making these loans. With respect to the $5,000 matter, the court, referring to the conversation between Heilig and Mrs. Munger, as stated, charged the jury as follows: "Now, that would be testimony, so far, simply to initiate a transaction for a loan. Unless you are satisfied from all the testimony in this case that it was then understood by Mrs. Munger and by Frank Heilig that this was to be considered as sufficient, and that he was authorized to take the money out for that purpose without further consultation with her, without requiring any check from her to cover the amount, * * * that assent alone would not be sufficient to constitute her authority for his taking the $5,000 from her account in the bank. But, even if you should find that she did not so authorize him,—that it was not so understood between her and Heilig,—you should look further in the testimony to ascertain whether she had ratified that act by her subsequent conduct. It appears by the testimony that a statement of account was produced by the plaintiff, upon the demand of the defendant, for the purpose of this trial. That statement has been introduced in evidence. There are three statements, but there is one in particular which mentions a note of Frank Heilig for $5,000. There is no testimony in this case definitely fixing the time when that statement was received by Mrs. Munger. It is not claimed there is proof of its actual delivery to her at that particular time, except as you may determine from the appearance of the paper itself. I think Mr. Heilig states that he did give it to her,—either delivered it to her, or sent it to her, he could not tell which; but he did not attempt to fix the time. If you can, by an inspection of the paper, and a comparison of the figures, and the items contained in it, in connection with the bank books and other statements in this case, ascertain the time when it was delivered to her, you are authorized to do so from all the testimony in the case, and determine if you can at what time it was delivered, for the purpose of ascertaining the fact of any information conveyed to Mrs. Munger of the making of the note for this $5,000. The proposition is correct, generally, that a party cannot be held to have ratified the act of an agent, unless he is wholly and truthfully advised as to all the facts in relation to it. But I doubt whether that would be applicable to the extent of holding that Mrs. Munger would not be chargeable with this sum for the reason alone that Frank Heilig had not told her of the time when he had in fact taken the money. It is claimed that he had at this time taken a much larger amount,—nearly ten thousand dollars. But if Mrs. Munger intended to give him a loan of the five thousand dollars, and believed and understood that the loan was then consummated,—that her

consent was then given that he was to draw the money out,—then it is the opinion of the court that Mrs. Munger would be responsible for that amount, and that the bank cannot be held chargeable for the payment so made."

With respect to the loans of $1,000 to Wall & Spaulding, and of $400 to A. C. Payne, and the $75 paid to Heilig by the bank after his relations with the bank as teller had ceased, and appropriated by him to his own use, the court instructed the jury: That the bank had no right to make any charges against Mrs. Munger's account, unless it appeared by the testimony that Heilig had authority, or had good reasons to believe and understand from the conduct of Mrs. Munger towards him that he was authorized, to draw moneys from the bank for the purposes mentioned in these items. That it appeared by the testimony that Heilig had no express authority to do so, either verbal or in writing. If authority to take the money and charge it to Mrs. Munger's account existed, it must be found in her assent to transactions of that kind which actually came to her knowledge, and that she, with full knowledge of the facts, acquiesced in that method of doing the business, and that the burden of proof was with the defendant to show that Heilig was so authorized.

The jury found a verdict in favor of the plaintiff below for the amount claimed, $14,435.06, with interest from date of demand, amounting in all to $15,012.46, upon which judgment was entered, and to reverse that judgment this writ of error is sued out.

Gabe Bouck, for plaintiff in error.
F. C. Winkler and C. F. Fawsett, for defendant in error.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after thus stating the facts, delivered the opinion of the court.

It is elementary that a principal is bound by the wrongful act of his agent within the scope of the agency. It is also correct to say that a principal is bound by those acts of the agent in pursuance of powers directly conferred, or which were incidental to those powers and not prohibited, "because they are the direct result of his voluntary and intentional act." Mechem, Ag. § 282. This author, in the same section, also asserts the rule to be that the principal "is likewise responsible, and for the same reasons, for those acts which he has intentionally led third persons to believe that he has authorized. He is responsible for the acts of the agent which he has by neglect, omission or acquiescence led the person dealing with the agent to believe he had authorized, because to deny them would be a fraud upon innocent persons." There is, however, a duty resting upon one dealing with the agent of another, and that duty is thus well stated by the same learned author:

"Every person dealing with an agent is bound to ascertain the nature and extent of his authority. He must not trust to a mere presumption of authority, nor to any mere assumption of authority by the agent. He must at all times be able to trace the authority home to its source." Section 289. "The person dealing with the agent must act with ordinary prudence and reasonable diligence. If the character assumed by the agent is of such a suspicious or unreasonable nature, or if the authority which he seeks to exercise is of such an unusual or improbable character, as would suffice to put an ordinarily prudent man upon his guard, the party dealing with him may not shut his eyes to the real state of the case, but should either refuse to deal with the agent at all, or should ascertain from the principal the true condition of affairs." Section 290.

The situation is complicated when the transaction involved is conducted upon both sides by one who is in some manner or in some respects the agent of both principals in the particular matter. In such case a careful scrutiny of the facts surrounding and controlling the transaction is essential, to determine in what particular he was the agent of each principal, and whether the knowledge he possessed of the wrongful act as the agent of the one is imputable to the other principal. The cases to which we are referred discuss these principles at length, but the result in each case is controlled by the particular facts stated. The authorities perhaps may be properly classified as follows: First. Those in which the one principal received, through the intervention and the wrongful act of a mutual agent of the parties, the property of the other principal. In such case the party receiving the property of the other is chargeable with the knowledge of the wrong which was possessed by the mutual agent. Or, to state the proposition shortly, one may not avail himself of the results of his agent's fraud without responsibility for the fraud. Bank v. Cushman, 121 Mass. 490; Loring v. Brodie, 134 Mass. 453; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496; First Nat. Bank of New Milford v. New Milford, 36 Conn. 93; Holden v. Bank, 72 N. Y. 286; Bank v. Dunbar, 118 Ill. 625, 9 N. E. 186. Second. Those cases in which the fraudulent agent, being the agent of both parties, did not in the particular transaction represent the principal sought to be charged, but was, on one side of the transaction, representing himself, and the principal, in person, or others representing him, were upon the other side. In such case knowledge of the wrong is not imputed; otherwise, however, if in the particular transaction the agent acted for both principals. Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282; Bank v. Babbidge, 160 Mass. 563, 36 N. E. 462; Corcoran v. Cattle Co., 151 Mass. 74, 23 N. E. 727; Bank v. Davis, 2 Hill, 451; Bank v. Christopher, 40 N. J. Law, 435; Bank v. Irons, 8 Fed. 1, and note; Bank v. Blake, 60 Fed. 78; Niblack v. Cosler, 74 Fed. 1000, affirmed on appeal in 47 U. S. App. 637, 26 C. C. A. 16, and 80 Fed. 596; In re Plankinton Bank, 87 Wis. 378, 58 N. W. 784. Two cases cited by counsel are possibly exceptional,—not falling within either of the classes specified. In the case of Gunster v. Power Co., 181 Pa. St. 327, 37 Atl. 550, it was held:

"An exception to the general rule that notice to the agent is notice to the principal arises in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent acts for himself in his own interest, and adversely to that of the principal. Where an agent representing two principals conducts a scheme to defraud one of them, it will be presumed that he did not disclose to the principal he intended to cheat the means by which he intended to effect his purpose. An intended fraud committed by an agent on his own account is beyond the scope of his employment, and bears analogy to a tort willfully committed by a servant for his own purposes, and not as a means of performing the business intrusted to him by his master."

In that case the treasurer of a manufacturing corporation, being also vice president of a bank, executed two promissory notes in the

name of the manufacturing corporation, signing them as treasurer. These notes were discounted by the bank, and the manufacturing corporation was given credit for the proceeds. On the same day the treasurer drew the check of the manufacturing corporation "to the order of dft. N. Y." As vice president he caused the amount of the check to be charged to the manufacturing corporation upon the books of the bank, and on the same day, in payment of the check, he drew two drafts upon New York in the name of the bank, and signed by him as vice president, making them payable to his own order. He received payment of the drafts in currency, and used the proceeds for his private purposes. In a suit brought by the bank against the corporation upon its promissory notes, the court ruled that as treasurer of the manufacturing corporation he had the authority to execute the notes and the check for the proceeds of the discount, and that the manufacturing corporation, and not the bank, was liable for the loss. "The real question," says the court, "is, in what capacity did Jessup commit the fraud? It is clear it was as treasurer of the appellee. It was as treasurer he presented the notes for discount, and as treasurer he drew the check for the proceeds. Both acts were within his authority as treasurer, and would have been lawful if they had been honest; but he drew the money on drafts which were the property of the company, and when he embezzled the money it was the money of the company. The bank had no part in his act, and gained nothing by it. The fraud had its inception and consummation in acts done in his capacity of treasurer of the defendant company, and it should bear the loss."

In Daniels v. Bank, 92 Hun, 460, 38 N. Y. Supp. 580, the plaintiff, in 1875, being unmarried, went to Europe, and just previous to her departure left with one Dann, who for a long period had been the secretary, treasurer, and general financial manager of the bank, blank checks, signed by her, to be filled and used by him during her absence as she should direct. She returned the following year, and in April, 1879, without authority, Dann filled one of these checks for $4,000, and used it to cover up his fraudulent transactions with the bank. It was held that the plaintiff was not chargeable by the bank with the check, that the knowledge of Dann was the knowledge of the bank, that he knew of the plaintiff's return from Europe, that his agency had been revoked at the time when the check was filled out, that the bank was chargeable with knowledge of those facts, and that the rule that, when one of two innocent persons must lose, he should bear the loss who made the loss possible, did not apply. The court, in delivering judgment, observed:

"Considerable stress now appears to be laid upon the fact that the check in question was not in any way altered by Dann, and that in filling it up as he did he was acting within the scope of his authority as the plaintiff's agent. The obvious answer, however, is that the agency conferred upon Dann by the plaintiff was for a particular purpose, and to cover only such time as she should be absent from the country, and it undoubtedly terminated with her return to America in 1876. Two years thereafter she changed her name from Enos to Daniels. These facts were, of course, all well known to Dann, and his knowledge was the knowledge of the bank; and, with this knowledge, it

is difficult to see anything in this contention upon which the defendant can rest its claim that the plaintiff should be charged with the amount of this check. Again, it is charged that the bank is entitled to the benefit of this check, upon the principle that, when one of two innocent parties must suffer by reason of a fraudulent transaction, it shall be the one whose act made it possible for the fraud to be perpetrated. This principle might be invoked with great propriety if the circumstances of the case were different,—in other words, if Dann sustained the relation of a third party, simply, and had no connection with the bank; but here, confessedly, he was not only the secretary and treasurer of the bank, but he had the general charge of its affairs, and was in fact himself the bank, and, bearing this intimate relation to the bank, it would be a strange perversion of the rule to hold that he might perpetrate a fraud like the one in question, and yet the bank be permitted to profit thereby."

These two cases, upon first blush, might seem not to be in accord. They may perhaps be reconciled upon the ground that in the first case the treasurer of the manufacturing corporation had full power to sign the notes and checks of the corporation, and had actual authority to draw the money from the bank; while in the latter case, the authority of the agent being revoked by the principal's return, the agent was without authority to fill up or use the check, and that as the agent, being the chief financial officer of the bank, conducted the transaction on behalf of the bank, the latter was chargeable with knowledge of the want of authority and of the intended wrong.

We are not, however, called upon to reconcile these cases, if they are divergent; for the case in hand, in our judgment, falls within principles recognized by both cases.

We proceed to inquire which party litigant, within the principles stated, should bear the loss for the moneys withdrawn by Heilig. It is conceded that he had no actual authority from the defendant in error to withdraw moneys from the bank on her account. Heilig himself so states. The conversation stated by the cashier of the bank to have been had with Mrs. Munger gives no color of authority so to do; nor does he venture to say that he so understood, or that he permitted Heilig's acts, relying upon any such statements or assumption. The extent of the agency, so far as the record discloses, was to make loans for Mrs. Munger under her direction, to collect interest, pay taxes, collect moneys paid in on her account, and to deposit them to her credit in the bank. The custom was, upon the making of a loan or upon drawing moneys from the bank, to obtain from her a check for the desired amount, which was presented to the bank, and constituted the latter's authority to charge Mrs. Munger's account. This custom was known to the bank. Over $92,000 was thus paid by the bank upon such vouchers. Heilig was at the time the paying and receiving teller of the bank, and trusted by it with the duty of determining upon the sufficiency of a voucher or check presented to the bank for the payment of money. Thus, unauthorized by Mrs. Munger, he takes to his own possession, and for his own use, moneys of the bank which were in his keeping and under his control as such teller. In so doing, we are clearly of the opinion that he acted as the teller of the bank. He could not do that except as such officer. He made and delivered to the bookkeeper a teller's

memorandum for each such amount drawn, directing the charge of the amount to the debit of Mrs. Munger's account. In so doing, in what capacity did he act? These vouchers were certainly not made by or with the authority of Mrs. Munger, nor did they purport so to be made. Heilig himself states, "No one but an officer of the bank ever makes such a memorandum." They were in fact merely the minutes of transactions made by a teller of the bank as a direction to the bookkeeper with respect to charges to be entered in the books, and of course the bank, in making such a debit, must take the responsibility of its correctness, and of the authority of the teller to direct it.

Doubtless Heilig designed to defraud Mrs. Munger, and not the bank; but the acts which he did, the means which he employed, were not within the scope of his agency for Mrs. Munger, but were those which could only be done and employed by an agent of the bank, and in that capacity. It was not otherwise possible to accomplish the theft. In the language of the supreme court of Pennsylvania in Gunster v. Power Co., supra, "The fraud had its inception and consummation in acts done in his capacity" of teller of the bank. The acts themselves furnish no reason to the officers of the bank to infer an apparent, still less an actual, authority from Mrs. Munger. They were acts directly opposed to the custom in all well-ordered banking institutions, in direct contravention of the usual custom of business all over the civilized world, in clear opposition to the custom in which this particular agency was conducted, as the officers of the bank knew, or should have known; for the checks of Mrs. Munger upon this account, to the number of several hundred, and to the amount of over $92,000, were, in the course of business delivered to and honored by the bank. These wrongful acts of Heilig, of themselves, were "of such suspicious and unreasonable nature, and of such unusual and improbable character," to challenge scrutiny and create alarm. The president and cashier of a bank may not shut their eyes to what is going on around them. They are placed in control and supervision of those under them, and that supervision should be vigilant. This dishonest teller, a month after this agency for Mrs. Munger began, was allowed by the bank to take the sum of $4,000, in one sum, and to have it charged by the bank to Mrs. Munger's account upon a debit memorandum made by himself. Such acts were permitted from time to time during a period of six years, without suggesting alarm or inducing inquiry upon the part of the officers of the bank. If, from his long service in the bank, its officers placed undue confidence in Heilig, and failed in careful and vigilant supervision, the bank, and not Mrs. Munger, must assume the responsibility for his unauthorized acts. His conduct should have put an ordinarily prudent man upon his guard. The acts which he did were within his duties as teller, and, within the principles asserted in the Pennsylvania case cited, his knowledge of the wrong was the knowledge of the bank. The loss was made possible by the authority conferred by the bank upon its teller, and therefore we think that the court below was justified in holding that the bank was responsible for these acts of its servant.

With respect to the $5,000, part of the moneys so taken, and represented by the note of Heilig for that amount, it appears that, after more than that amount of money had been abstracted, he suggested to Mrs. Munger the subject of a loan to himself of $5,000 upon timber lands. He did not desire a loan. He was merely seeking to cover up the fraud he had perpetrated upon the bank, and in some way to commit Mrs. Munger to the sanction of his wrongful act as teller, and in directing the charge of that amount to Mrs. Munger's account. He neither suggested the time nor the terms of the proposed loan, nor the property upon which it was to be secured, nor his title thereto. Upon her expression of willingness to make him a loan, and without further negotiation, without any examination of title, without the making of any mortgage, without the submission to her of any facts, and without her knowledge, he signed a note payable to Mrs. Munger in five years, and indorsed upon the back a description of lands in which, it was said, he had a half interest, placed that note in the box containing her securities, which was in his exclusive keeping, and carefully concealed the facts from her knowledge. To seriously speak of this transaction as a perfected loan, which would bind Mrs. Munger and relieve the bank from the act of its dishonest teller, shocks the moral sense. It was no loan of money. It was a bald subterfuge to impose upon her the responsibility for the prior theft by the teller of the moneys of the bank. Condonement of fraud cannot be procured by fraud. In this transaction Heilig assumed to act both for himself and for his principal, and it would require clear evidence of knowledge and assent to hold the principal bound, "for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time." Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 564, 38 N. E. 714. The court below submitted the question to the jury whether a loan was in fact consummated, and whether Mrs. Munger authorized Heilig to draw the moneys, and charged them that, if such were the case, Mrs. Munger would be responsible, and the bank could not be held for the sum so taken by its teller. It seems to us that the charge was certainly as strongly in favor of the bank upon this branch of the case as it ought to have been. The jury, under the charge, found the issue in favor of the defendant in error, and certainly the bank has no reason for complaint.

With respect to the asserted ratification of this supposed loan of $5,000, it is to be said that ratification must be founded upon knowledge of the facts, and must be an intelligent affirmance and adoption of unauthorized acts. This affirmance is sought to be proven or inferred from the fact that Exhibit R2, which contained a statement of this note of $5,000, was delivered to Mrs. Munger. The testimony of Heilig is not clear upon this question, as he at one time affirmed that he did not, and at another time that he did, deliver it to her, but could not state the time of such delivery. The record does not disclose which party produced that statement at the trial. It is assumed by counsel for the plaintiff in error that this must have been the statement presented to Mrs. Munger, at Oshkosh, in the

autumn of 1894, before she removed to Chicago, and this conclusion is deduced from the face of the document. A careful scrutiny of the paper satisfies us that it is not the one then delivered. This paper contains a written statement of certain securities and at the foot, in pencil, in the handwriting of Heilig, is a statement of receipts, including interest from January 1, 1894, to October 1, 1894, and subsequently, footing up $3,091.47, against which sum is the date "January 1, 1894," which is manifestly an error and is intended for January 1, 1895, as the first entry in the column is a statement of interest to October 1, 1894, and the exhibit contains a statement of a loan to Houghton of $1,050, also included in Exhibit S2, which states its date as January, 1894. Again, the paper contains in pencil a statement of notes delivered to Mrs. Munger, which are doubtless the ones which she took with her to Chicago in the autumn of 1894. Upon its face, it would rather seem that, if this statement was produced at that time, it remained in Heilig's keeping, and the writings in pencil were placed there by him after Mrs. Munger's departure. Exhibit S2, which is a statement manifestly prior in time to that of Exhibit R2, has the entry of a loan dated January, 1894, which is subsequent to the date of the Heilig note of $5,000, but that statement makes no mention of the latter. This statement, Exhibit S2, he testifies, he delivered to Mrs. Munger before she went to Chicago. Of course, a statement delivered and retained by a party, which referred to a note of that magnitude, even with imperfect knowledge of the facts, might be strong to show acquiescence; but in the doubt which is cast upon the fact of delivery or the time of delivery, coupled with the direct denial by Mrs. Munger of any knowledge of the matter or of the giving of any authority to withdraw the money, renders it peculiarly a question for the jury, and that question was fairly submitted to them by the court below.

With regard to the matter of money loaned to Wall & Spaulding, taken from the bank without the authority of Mrs. Munger, and which Heilig says was repaid to him, and which the bank books show did not go to Mrs. Munger's account or inure to her benefit, upon the principle above stated the bank is responsible for it; for, having delivered the money to its teller without authority of Mrs. Munger, it has no right to charge her account therewith, unless she has knowingly ratified the act, or the bank can show (for the burden rests upon it) that the money has inured to her benefit.

With respect to the loan to Arthur C. Payne, which appears to amount to $400, it need only be said that the matter stands upon the same footing as the loan to Wall & Spaulding, with this exception: That on June 16, 1895, Heilig reported to Mrs. Munger a loan made on one year's time to Payne, of $200. This appears in an account as an expenditure, and is deducted from receipts. It may be doubted whether that fact should be construed into a notice to Mrs. Munger that her agent was drawing moneys from the bank on her account without her check. For all that appears upon the face of the letter, the money may have been taken by him from moneys collected and not deposited. It might perhaps be a ratification of her agent's act in loaning to Payne that amount. The whole mat-

ter, however, was fairly submitted to the jury, which has found adversely to the plaintiff in error, and we are not at liberty to disturb the verdict. If we were, we should be loth so to do, or to abate the amount, since the total sum to which the plaintiff seems entitled is over $1,300 in excess of the amount claimed and recovered.

The question respecting the loans to the Pearson Refrigerator & Cold-Storage Company, representing the amount of money charged to Mrs. Munger by the bank after Heilig had severed his connection with the bank, and by his direction credited to the Pearson Refrigerator & Cold-Storage Company, in which he was a party chiefly interested, is set at rest by the principles of law herein stated, and the court correctly directed a verdict against the bank for that amount. It could not charge that sum, or any sum, to Mrs. Munger, upon request of her agent acting without authority. It was bound to ascertain the extent of his powers; and, authority being wanting in the agent, and as he could not thus deal for the principal in a matter in which he was personally interested, the bank acts at its peril. Chrystie v. Foster, 26 U. S. App. 67, 72, 9 C. C. A. 606, and 61 Fed. 551. The same remarks are applicable to the sum of $75 which the bank permitted Heilig to take after he had severed his connection with the bank, and which it charged to Mrs. Munger's account. Upon this item the court fairly submitted the question to the jury.

It is charged that Mrs. Munger was grossly negligent in her dealings with her agent. It may not be denied that to some extent she is subject to the charge of neglect. She, without doubt, placed undue confidence in him. But her carelessness and imprudence in no way induced action upon the part of the bank. No act is shown indicating that she had intentionally led third persons to believe that Heilig had authority to draw moneys, or which warranted the bank in so believing; and it does not appear that the bank, in permitting the action of Heilig, acted upon any knowledge of her supposed neglect, or believed that Heilig was so authorized. If nothing may be excused to her by reason of her sex, or by reason of her manifest unfamiliarity with business affairs, what shall be said of trained, experienced, and skilled officers of a bank, who, in contravention of the recognized course of business, have permitted its teller for a series of years to act in disregard of well-settled rules of banking, whereby he used his position, and the means which they placed in his hands, to unlawfully take the moneys of the bank, and who now seek to charge his acts upon one for whom he acted in a limited way, but from whom he had no authority to do in her name the things which the bank permitted him to do. We are satisfied that the verdict is just, and that no reversible error occurred in the submission of the case. We have not dealt in detail with the specific requests to charge, or with the exceptions to the charge as given, because, as we think, under the principles which must govern, the charge was correct. We also take no account of the acts of Mrs. Munger's son during her absence abroad. He acted without authority, and without knowledge of the extent of the agency, or of the things done in pursuance of it. What he did was merely tentative, to

protect her estate from possible loss until his mother could be advised. Her repudiation of Heilig's acts immediately upon her return, and upon notice of them, was, we think, timely, and efficient to discharge her of responsibility for them. The judgment is affirmed.

GROSSCUP, Circuit Judge, sat at the hearing, and concurred in the decision of this cause, but, by reason of illness, had no share in the preparation of the opinion.