W. T. Dow, Appellee, v. Stockport Savings Bank, Appellant.

**BANKS AND BANKING:** Deposits—Unauthorized Charge Against Deposit. A bank must pay out its depositor's funds strictly as directed by the depositor. Evidence reviewed, relative to an unauthorized charge against a deposit, and held that the depositor was not estopped to question such charge, nor was he negligent in reference thereto, nor had he ratified said charge.

**BANKS AND BANKING:** Officers—Authority—Estoppel. A bank may not dispute the authority of its president in making or causing to be made an unauthorized charge against a depositor's account, and at the same time claim the benefit of the charge.

**BANKS AND BANKING:** Deposits—Unauthorized Payment—Negligence. A depositor is not bound to anticipate that his banker will wrongfully make payment from the deposit, and is under no obligation to call for his pass book in order to determine whether such payment has been made.

**ACCOUNT STATED:** Essential Element. Principle reaffirmed that an account stated rests on voluntary assent of the parties.

Headnote 1: 7 C. J. pp. 669, 673. Headnote 2: 7 C. J. p. 539. Headnote 3: 7 C. J. p. 638. Headnote 4: 1 C. J. p. 686.

Headnote 3: 3 R. C. L. 533. Headnote 4: 27 L. R. A. 816; 7 L. R. A. (N. S.) 924 (Anno.); 1 R. C. L. 211.

*Appeal from Van Buren District Court.*—D. M. ANDERSON, Judge.

NOVEMBER 16, 1926.

Depositor's suit against a bank for an accounting. Decree for plaintiff. Defendant appeals.—*Affirmed.*

*Ben J. Gibson,* Attorney-general, *Roberts & Webber, Cornell & McBeth,* and *H. B. Sloan,* for appellant.

*J. C. Calhoun* and *A. Hollingsworth,* for appellee.

MORLING, J.—As the case comes here, the only item in question is a charge made by defendant to plaintiff's account, of $5,518.19. Defendant claims the credit because of its having paid a sight draft for that amount, drawn

1. BANKS AND BANKING: deposits: unauthorized charge against deposit.

by Keller upon plaintiff, to pay the balance of a note of $10,000 held by Keller, and signed by plaintiff and by J. H. McCarty, who was the president of the defendant bank. The record shows no semblance of authority to defendant to pay this sight draft. The defendant was not the holder of the $10,000 note, and therefore had no implied authority, as the holder of a note owed by plaintiff to it, to take the amount of it out of plaintiff's account. It is not argued that a bank may pay a sight draft drawn upon its depositor and take credit for it without the depositor's authority. The case stood as one brought by the plaintiff, claiming that he should have a balance of $11,518.19, for which he had never issued checks. The defense stood on a general denial, until after the close of the evidence, when defendant filed an amendment to conform to the proof, alleging that plaintiff's pass book had been balanced and returned to him, with canceled vouchers, and he had made no complaint, and was estopped, "especially so in view of the fact that the president of the bank, J. H. McCarty, is

now hopelessly insolvent, and in view of the further fact that, if the plaintiff ever had a right to complain as to the manner of handling said account, that he was bound to make his complaints sooner, and at a time when the defendant bank would have had an opportunity to have pressed the matter against its president, McCarty, at a time before said McCarty became hopelessly insolvent.''

The items making up the $6,000 difference between the $11,518.19 and the $5,518.19 were not pressed by plaintiff. So the question before us is whether there was any negligence, estoppel, or ratification as to the item in question, or whether there was an account stated, which precluded the plaintiff from maintaining the action.

The $10,000 note was dated March 2, 1920, due March 15, 1920, payable to E. E. Keller, signed by plaintiff and McCarty. The plaintiff's claim is that this money was borrowed, one half for him and one half for the defendant bank. Defendant denies that any of the money was borrowed for it. This question is immaterial, so far as its authority to pay the note or the sight draft is concerned; for not only was there no authority, as has been stated, but the plaintiff got no benefit of one half of the $10,000 borrowed on this note. Either defendant or McCarty got the benefit of it. While the whole amount, $10,000, was deposited to plaintiff's credit, $5,000 was charged out of his account on a debit slip, reading as follows:

''W. T. Dow

    To J. H. McCarty

       For Shacklee Deal

3-12-20                          Paid 3-15-20.   72-1601.''

The record does not show what is meant by ''72-1601,'' nor what corresponding credit entry was made, nor that the item did not inure to defendant's benefit. The only relevancy of the question whether one half, $5,000, was being borrowed for the defendant or for McCarty is to the question raised by defendant that McCarty was plaintiff's partner or agent, and that defendant was not chargeable with McCarty's knowledge of plaintiff's relationship to the loan or the note, or of the rights of plaintiff and McCarty, as between each other, in respect to the loan or the transactions growing out of it.

We may say in the first place that this question is immate-

rial, because it remains true that the bank, without any author-- ity, charged the sight draft to the plaintiff, and is now claiming the benefit of the charge. If the sight draft was paid, and the book entries were made by Mc- Carty,—which do not appear,—McCarty had access to them, and to defendant's funds out of which the sight draft was paid, and had access to plaintiff's account by virtue of his position as defendant's president; and what he did in the use of defendant's funds and in paying the sight draft and charging the amount on defendant's books to the plaintiff, he did as defendant's president, and not as agent for the plaintiff. *Holden v. New York & Erie Bank,* 72 N. Y. 286; *National Bank of Osh-- kosh v. Munger,* 36 C. C. A. 659 (95 Fed. 87); *Welsh v. German American Bank,* 73 N. Y. 424; *Central Metro. Bank v. Chippewa County St. Bank,* 160 Minn. 129 (199 N. W. 901). Defendant is ratifying the charge. Furthermore, there is no claim that plaintiff and McCarty got the $10,000 for use in any joint transaction. Plaintiff used $5,000 for his own individual purposes. The other $5,000 was used by the defendant or by McCarty, or both, in their own affairs, and not in anything in which the plaintiff had any interest. As between the plaintiff and the defendant, or the plaintiff and McCarty, the plaintiff was principal debtor for $5,000 only, and surety for the other $5,000. There is no evidence of any joint relationship between McCarty and plaintiff as to the money borrowed, or any agency on the part of McCarty for plaintiff for any purpose.

2. Banks and Banking: officers: authority: estoppel.

Sometime before the $10,000 note was given, plaintiff, anticipating that he might want to borrow some money, as he says, asked McCarty "if the bank was in any shape to let us have a loan, if we happened to need it temporarily, and he said there wasn't any chance at all at that time." Plaintiff thought he wanted $4,000 or $5,000. Plaintiff testifies that, at the time he signed the $10,000 note, McCarty "said the bank was needing money. * * * 'You probably need some, and this man won't let the bank have it without somebody's signature, and if you will sign with the bank, we can get this $10,000, and we will have it here in the bank anyway, which will help the bank, and you can have out of it any amount you need, up to $5,000.' He says, 'The bank will use the balance of it, and if you don't need that much, the bank will use whatever you don't need.' That is the

way I come to borrow that money. * * * I started to sign with the bank on that $10,000, and I called Mr. McCarty's attention * * * that no other signature was there yet, and I didn't want to put my name down first. He says, 'I am awfully busy today.' He says, 'You go ahead and put your name down there, and I will have the proper signature put on here later, when I get time;' and I never saw the note again until it was returned. * * * I didn't know whether he, as president of the bank, had authority to sign it then and there. * * * I supposed he got the proper signatures.''

He also said that McCarty told him he could get the money for a year. Keller testifies that:

''McCarty first spoke to me about making that loan. Well, there was a mortgage on that farm that I got from Mr. Dow, for $10,000, to run for 15 days, and when I came to Stockport to pay for the farm, Mr. McCarty says, 'We are awful short of money here in the bank, and we would like to borrow this $10,000 for a year,' and he says, 'This mortgage ain't due on your farm, and leave that run over.' * * * I says, 'No, I ain't going to have a mortgage on my farm for $10,000 and loan the money to the bank.' ''

He did, however, loan the money for 15 days. He testifies:

''I asked Mr. McCarty, I says, 'You are sure you're going to have this money by the 15th, so you can pay this mortgage off?' He says, 'Yes, sure, we'll have it. We'll take care of that mortgage.' Well, McCarty told me him and Mr. Dow was going to sign the note. I told him, if they would sign the note, it would be all right, for 15 days. I don't know as I asked anybody to sign it. I wouldn't say I didn't, because I know the note was signed. I couldn't say it was signed there at the same time, because it seemed like we kept running in and out for all morning before we could get our turn to settle. I don't know if I did or not see Dow sign the note.''

Another witness says that Dow's name was signed first.

''It just had the one signature on at that time, and Mr. Dow spoke about the other signature, being put on the note. Mr. McCarty says, 'I am very busy, and I will see that the note is properly signed.' ''

There was no reason for McCarty's not then signing the note, if it was understood to be his individual business, and he

was not representing that the note would be signed in behalf of the bank. Both plaintiff and Keller are unqualified in their statements that they supposed they were dealing with the bank, and not with McCarty individually, in respect to this loan. McCarty's testimony is:

"I don't recall all of the details of the making the loan. * * * my recollection is that Mr. Keller loaned the money to Mr. Dow voluntarily. I don't remember whether I asked him to make the loan, or whether Dow mentioned it to him. I don't remember that Dow and I talked about the matter before. It was, as I recall it,—it sprung up right there that day. * * * Keller had told Mr. Dow that he had that amount of money he could let him have for that length of time, and Mr. Dow, as I recall it, signed the note. Mr. Keller turned around to me, and asked if I considered Mr. Dow good for that amount of money. I said, 'I believe he is.' 'Well,' he says, 'if you think he is good, would you have any objection to signing the note with him?' I said, 'I don't think I would have any objection at all to signing the note with Mr. Dow,' * * * I think I signed it right then and there."

He says he has no recollection of telling Keller or Dow that the bank was short, and wanted money. Asked whether he was interested in borrowing the money for the bank, he says that that was not his intention. Asked whether he ever said or did anything intentionally to lead Keller or Dow to believe that the bank was getting any part of the money, or would make itself liable, he answered, "Not intentionally." He says that his recollection of a conversation with Mr. Dow a few days later was that he was told by Dow: " 'If you have any need any part of that money, go ahead and use it. You have signed the note.' I said, 'All right, I may have occasion to use half of it.' " He says that he did use half of it, but doesn't remember how he got it. Plaintiff says he didn't see the $10,000 note, or know how it was signed, until it was returned to him with the sight draft.

The note was not paid, and Keller interviewed McCarty about it. Keller says that it was then arranged that, if half of it was paid, the other half could stand until March 1, 1921; that McCarty said he could get the money from the Birmingham Bank, and he would mail a note to plaintiff in Chicago for $5,000; that a note for $5,000, signed by plaintiff, was sent to the

Birmingham Bank, payable to Keller's order, and Keller had to indorse it, to get the money on it. Plaintiff testifies without contradiction that, "when McCarty got the $5,000 note, he had instructions not to use it, except the $10,000 note was taken up," and that McCarty told him it was taken·up. The $5,000 realized from the smaller note was indorsed on the $10,000 note. Plaintiff testifies also, without contradiction, that he had left in the defendant bank the money to pay the $5,000 note, and was expecting defendant to return that note to him, and that he supposed it was paid, and would be handed to him. McCarty's testimony is not only in conflict with that of the other witnesses, but is inconsistent with the circumstances, and not entitled to acceptance. On March 1, 1921, Keller drew the sight draft in question, for $5,518.19, the balance of the $10,000 note, on the plaintiff, "care Stockport Savings Bank." It seems to be assumed that the $10,000 note accompanied the draft, and was returned to plaintiff with the draft and other vouchers. The only evidence as to when plaintiff received or knew of the sight draft and the payment of it out of his account is his own testimony that it was September 21, 1921, or shortly afterward. The only evidence on the subject of the payment of the draft is McCarty's testimony:

"Q.  *  *  * The fact is that, under the circumstances, and after you had taken $5,000 out of his account, and after he had paid another $5,000 with a note, you honored a sight draft for $5,000 and the interest on all of it after that March 3, 1921, didn't you? A. Yes, sir."

We are of the opinion that, on this, and also on the testimony about to be set out, there is no foundation for defendant's claim that defendant is not chargeable with McCarty's acts and knowledge in respect to the transactions in controversy. Plaintiff's business with McCarty throughout was with him as an officer of the bank.

In the examination of the plaintiff, the year 1920 was frequently named in the questions and in the answers, when the year 1921 was undoubtedly meant. Plaintiff referred to the pass book as refreshing his memory when it was balanced and returned to him. The pass book shows balances March 4, April 9, and September 21, 1921. The checks are not itemized in the book. The plaintiff testifies that he called for the book at various

times, and was told that it had been balanced sometime since, but would be balanced again; and he testifies positively that he did not have the book after the $5,518.19 entry, or receive the sight draft or the $10,000 note, or know of the charge to his account until September 21, 1921, and that he immediately went to the bank, "and called Mr. McCarty to the door, and he said, 'Yes,' but maybe that wasn't just exactly as I'd expect, 'but,' he says, 'the bank will take care of that all right,' and he says, 'Everything will be all right.' * * * and I asked him in regard to the other note, the $5,000 note,—I had left money in the bank to pay the $5,000 note, and they had returned this note to me. It was supposed to be paid, and he told me that the other note would be handed to me. 'The $5,000 note,' he says, 'will be handed to you as soon as it is returned to the bank.' So I was satisfied. I did not say anything more to him about it because I thought, when the other $5,000 note was returned, they would hand it to me. Yes, he told me the bank would protect me in it."

Plaintiff says that McCarty told him, in October, previously, that the $10,000 was paid in full. Plaintiff's wife testifies that she went to McCarty a number of times, to get the $5,000 note; that McCarty said nothing about the $10,000 note. McCarty gave her a written statement on the bank's letterhead, that "it is understood that, as far as Mr. Dow is concerned, he is not obligated" by the $5,000 note; "that an agreement, oral or otherwise, has been made between" the bank which discounted and held that note, and "the Stockport Savings Bank, by J. H. McCarty, its president, that certain notes * * * are to be taken by said" bank holding the $5,000 note, "instead of the Dow note referred to above, and that Dow will thereby be and is released from the obligations of said note." The $5,000 note has not been paid, and suit is pending against the plaintiff, McCarty, and Keller upon it. The only testimony given by McCarty or in behalf of the defendant on this subject is that McCarty says that he does not remember plaintiff's speaking to him about the $5,518.19 or the sight draft.

"He might have, but I don't recall it. I don't have a very good recollection of the transaction about the sight draft."

There is no evidence that the other officers of the bank were unacquainted with the withdrawal of the $5,000 from plaintiff's account, or with the charge of the sight draft and balance of the

$10,000 to his account, or with any action induced by plaintiff to defendant's prejudice. There is nothing in the evidence bearing on McCarty's insolvency, except that, in the cross-examination of Keller, the defendant offered in evidence the answer which Keller filed in the suit against Dow, Keller, and McCarty on the $5,000 note. This answer alleged that Keller loaned Dow and McCarty $10,000, and it was, therefore, proper, as bearing on Keller's credibility in testifying that he was making the loan to the bank. The answer also alleged that, at the maturity of the $5,000 note, McCarty was solvent, but, "upon information and belief, that the said McCarty is at the present time insolvent." This was filed February 8, 1923. This allegation manifestly is not evidence against plaintiff, particularly as to McCarty's condition in March or September, 1921. It does not say that McCarty was insolvent when the sight draft was paid. There is no estoppel.

The defendant was obligated to pay from plaintiff's deposit only in the manner directed by him, and was bound to know whether payments made by it were authorized by plaintiff.

The plaintiff was not bound to anticipate that the defendant would make payments from his deposit negligently or wrongfully, and was under no obligation to examine his pass book to

3. BANKS AND BANKING: deposits: unauthorized payment: negligence.

discover whether defendant had done so. *German Sav. Bank v. Citizens Nat. Bank,* 101 Iowa 530; *Welsh v. German American Bank,* 73 N. Y. 424; *Glassell Development Co. v. Citizens' Nat. Bank,* 191 Cal. 375 (216 Pac. 1012); *Leather Manufacturers' Bank v. Morgan,* 117 U. S. 96, 112.

He was under no obligation to call for his pass book and checks within a reasonable time. *McCarty v. First Nat. Bank,* 204 Ala. 424 (85 So. 754).

When plaintiff discovered the charge, he immediately complained. For the reasons stated, McCarty was defendant's agent. He was at the bank in his official position by defendant's authority, held out by it to the public as its chief executive officer, entitled to represent it in its dealings. Plaintiff's protest was made at the bank, and to that officer, and to him in his official capacity. The protest was against the wrongful act of the bank. In behalf of the bank, and in the bank, and as its representative in the transaction, the president agreed to rectify the wrong.

McCarty, on the evidence, was acting in his capacity of officer of defendant. The bank is claiming the benefit of the payment of the sight draft, and is chargeable with knowledge of the protest made to him. *National Bank of Oshkosh v. Munger,* 36 C. C. A. 659 (95 Fed. 87); *Welsh v. German American Bank,* 73 N. Y. 424; *Holden v. New York & Erie Bank,* 72 N. Y. 286; *State Bank of Morton v. Adams,* 142 Minn. 63 (170 N. W. 925).

An account stated becomes such by reason of acquiescence; a meeting of the minds upon its correctness; a settlement. It rests upon some form of voluntary assent to it. 1 Corpus Juris 687, 688; *State Bank of Prairie City v. Cooper,* 201 Iowa 225; *Graham & Corry v. Work,* 162 Iowa 383, 388. There was no negligence on the part of plaintiff, no ratification, or account stated.

4. ACCOUNT STATED: essential element.

Defendant makes some complaint about the suit's being in equity. It is for an accounting, and there was no motion to transfer to the law side. Code of 1924, Section 10944.

The judgment is—*Affirmed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.